No. 32,563

PETERSIME INCUBATOR COMPANY, *Appellant,* v. W. E. FERGUSON, *Appellee* (W. E. FERGUSON and H. T. FERGUSON, doing business as FERGUSON BROTHERS HATCHERY, *Defendants*).

(53 P. 2d 505)

Opinion filed January 25, 1936.

*Joel E. Osborn, Jr.,* and *Elmer E. Martin,* both of Kansas City, for the appellant.

*Joseph Cohen,* of Kansas City, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action in replevin. Judgment was for defendant for damages on a cross petition. Plaintiff appeals.

Plaintiff manufactures and sells incubators. The home office of the company is at Gettysburg, Ohio. Defendants desired to engage in the business of conducting a chicken hatchery. A man by the name of Talbot was employed by plaintiff to sell its incubators. The extent of the authority given Talbot is the deciding factor in this case. All parties are agreed that Talbot sold three incubators to defendants for plaintiff. The purchase price of these was $3,150. Defendants paid $150 and gave eight notes for the balance. Four of these notes, for $375 each, were due on the first of March, April, May and June of 1933, and four of them were due on the first of the same months in 1934. The contract entered into by the plaintiff and defendants provided that all payments were to plaintiff and that all deferred payments were to be made at the office of plaintiff. The contract further provided that title and right of possession to the machines should not pass until the entire purchase price and interest had been paid, and that in case of default in any payment when due then the entire amount should become due and plaintiff should have the right to repossess the incubators. The date of the contract was November 21, 1932. When the first note was due, March 1, 1933, defendants did not pay it. On September 25, 1933, plaintiff brought a suit on the notes in the district court of Wyandotte county and procured the appointment of a receiver to take charge of the business of defendants. This receiver operated the business from September 26 to October 19, 1933. On the latter date the receiver was discharged. On January 26, 1934, plaintiff brought this action in replevin.

The petition alleged that plaintiff was the owner of the three incubators; that plaintiff was entitled to the immediate possession of them; that their value was $3,000; and that plaintiff had been damaged $500 by their detention. The prayer was for the possession of the incubators and for $500 damages for their wrongful detention. Only one of the defendants answered the petition. His amended answer and cross petition alleged that after the first of the notes

became due and on or about the first of March, 1933, defendant entered into an oral agreement with plaintiff by its duly authorized agent whereby plaintiff agreed to extend the payment date on the notes for one year on the payment to plaintiff of $35 and that such an amount was paid plaintiff by defendant in accordance with the agreement. The answer further alleged that subsequently defendant entered into another oral agreement with the plaintiff whereby the plaintiff agreed that in consideration of the payment to it by defendant of $200 to be applied in reduction of the balance due on the notes that the payment date on the notes would be extended one year; and that the $200 was paid in accordance with the agreement; that on or about September 20, 1933, defendant made a further agreement with plaintiff whereby it was agreed that in consideration of the delivery to plaintiff by defendant of a smaller incubator than the ones involved in this action, the plaintiff would give defendant credit for an additional $225 and would grant defendant an extension of a year on the date of payment of the notes; and that even though defendant is ready to comply with the agreement the plaintiff has refused to grant the extension.

In the cross petition and counterclaim defendant alleged that about the 26th of September, 1933, plaintiff filed an action against the answering defendant and his brother; that at that time defendant owned and was operating the hatchery business and was earning therefrom about $200 a month; that at the same time the petition in the above case was filed the plaintiff secured the appointment of a receiver to take charge of the business of defendant without giving defendant an opportunity to be heard "and by false and fraudulent representations to the court." The cross petition further alleged the receiver took charge of the business on September 26, 1933, was discharged as receiver on October 19, 1933, and was allowed a fee of $100 for his services and was directed to appropriate from the assets of the business the sum of $36.30 which was in the hands of the receiver when he was discharged; that the appointment of the receiver was wrongful and fraudulent, and that said false and fraudulent statements were made to the court orally in that plaintiff stated at the time it submitted said application for a receiver that this answering defendant was dissipating its assets, neglecting the business and threatening to remove, damage and injure the property described in plaintiff's petition. The cross petition then alleged that as a result of the appointment of the receiver defendant was de-

prived of the operation of his business; his credit was ruined; his standing and reputation with his customers was impaired; his business in the sale of feed was destroyed, causing him to lose the sum of $125 a month which he was able to earn; that he would be deprived of the feed business for a long time in the future; that he was compelled to spend $150 for attorney fees to defend the receivership suit; and that the expenses of maintaining the receivership were, paid out of the funds of defendant. The prayer was that plaintiff take nothing by its petition and for judgment for damages on the cross petition in the amount of $5,000. All of the oral contracts set out in the answer were alleged to have been made by one S. H. Talbot, the agent of plaintiff.

The reply of plaintiff denied the agency and authority of Talbot to make the contracts pleaded and denied specifically that the contracts were within the scope of the authority or employment of Talbot. The answer of plaintiff to the cross petition was a general denial. The pendency of the receivership suit was also pleaded as well as the fact that there was a motion pending at that time to modify the order discharging the receiver.

With the issues thus framed the case was submitted to a jury. A verdict for defendant in the amount of $1,250 was returned. Judgment was rendered accordingly. This appeal is from that judgment.

The first error argued by plaintiff is that there was no proof of the authority of Talbot to make the contracts pleaded. This was put in issue by the pleadings. The verdict of the jury in favor of defendant, later approved by the trial court, carries with it all findings necessary to uphold that verdict, if there was any substantial evidence to support it.

The theory of the defendant and the trial court was that Talbot was held out to the world as one having the authority of a general agent and that defendant was entitled to rely on that when dealing with him. The rule is stated in 2 C. J. 581 as follows:

"A general agent, unless he acts under a special and limited authority, impliedly has power to bind his principal by whatever is usual and proper to effect such a purpose as is the subject of his employment, and in the absence of known limitations third persons dealing with such a general agent have a right to act on the presumption that the scope and character of the business he is employed to transact measures the extent of his authority, and to hold the principal responsible for the agent's acts within such authority. This rule applies notwithstanding the agent disregards private instructions, provided the person seeking to hold the principal responsible for the agent's act was ignorant of such instructions."

In the case of *A. & P. Rld. Co. v. Reisner*, 18 Kan. 458, a station agent placed an injured workman in a hotel and promised that the company would pay his room and board. When the company argued that the agent had exceeded his authority this court said:

"In the case of a general agency, the principal holds out the agent to the public as having unlimited authority as to all his business. When the witness testified that Hyde was the general agent of the road at Atchison, he thereby gave evidence that the railroad company held out to the public such person as its agent in all its business and employment. In other words, the general agent of the company is virtually the corporation itself." (p. 460.)

To the same effect is the holding of this court in *Banks Bros. v. Everest & Waggener*, 35 Kan. 687, 12 Pac. 141. There the court held:

"Where an agent is held out to the world as one having the authority of a general agent, any private instructions or limitations not communicated to the persons dealing with such agent will not affect them nor relieve the principal from liability where the agent oversteps such limitations." (Syl. ¶ 2.)

See, also, *Hyson v. Bankers Mortgage Co.*, 136 Kan. 259, 14 P. 2d 726; *Townsend v. Railway Co.*, 88 Kan. 260, 128 Pac. 389.

We shall examine the evidence with this rule in mind. The undisputed evidence is that although the contract signed by defendants provided that it should not be in effect until it was approved by plaintiff, the incubators were actually installed on the property of defendants before plaintiff ever saw the contract; that is, the agent Talbot had them in his possession in Kansas City and had at least apparent authority to turn them over to any purchaser. The evidence also discloses that while the contract provided that there should be a down payment of $150 and that all payments should be made to plaintiff, this down payment was made to Talbot and plaintiff made no objection. The testimony of defendants was that when the first note became due the bank moratorium was in effect and it was extremely difficult to obtain money. The testimony was that Talbot called up from the home office and demanded payment of the note and finally consented to extend the note that was due March 1 until the next note was due upon payment of $35. This $35 was paid. No action was brought on the notes until long after this extension had expired. This was ample evidence from which the jury might have found that the extension was granted in consideration of the payment of $35.

The next extension about which there was testimony was the one that was claimed to have been made in September, 1933. Defend-

ants testified that Talbot agreed to extend the due date on the notes for one year on the payment of $200 and that he paid Talbot that amount. Besides the evidence already set out in this opinion we have the testimony of Mr. Petersime on this point, also some correspondence between the parties. During the early part of September, 1933, Talbot had threatened defendant with a replevin action to recover the incubators if the notes were not paid. This caused the following letter to be sent to plaintiff:

"September 20, 1933.

"Ira M. Petersime & Son, Gettysburg, Ohio.

"Gentlemen: *Re:* Ira M. Petersime & Son vs. Walter E. Ferguson, doing business as Ferguson Brothers Hatchery, 911 Southwest Boulevard, Kansas City, Kan.

"Mr. Ferguson has consulted me relative to a situation which has arisen over some notes due your company secured by a chattel mortgage on three No. 16 Petersime Incubators. Mr. Ferguson purchased these incubators from your company through your agent, Mr. S. J. Talbot, for the sum of $3,150, paying Mr. Talbot the sum of $150 in cash and executing eight promissory notes, four of which, in the sum of $375 each, are now past due. About the first of September this year, your representative, Mr. Talbot, called upon Mr. Ferguson and made an agreement with him whereby Mr. Talbot, acting for your company, agreed to accept the sum of $200 on account of said past-due notes and agreed to extend said past-due notes for a period of one year. Mr. Ferguson made this payment to Mr. Talbot and received his receipt signed by the company through him. During the bank holiday, Mr. Ferguson advanced to Mr. Talbot the sum of $35, which Mr. Talbot also agreed would be applied in reduction of the notes and at which time he also agreed that the extension would be granted. All of Mr. Ferguson's dealings have been with Mr. Talbot. We cannot understand now why Mr. Talbot would threaten to commence replevin proceedings for these incubators and insist upon payment of the past-due notes in direct violation of the agreements heretofore made and performed by Mr. Ferguson. This is to advise you that we insist that your company carry out the agreement made by Mr. Talbot, and that if you attempt to replevin these incubators in violation of the agreement, we shall contest your right to possession and at the same time will look to you for any damages which we may suffer. Yours very truly."

To this letter plaintiff replied as follows:

"Mr. Joseph Cohen, Suite 711-12-13, Huron Building, Kansas City, Kan.

"Dear Sir: We have your letter in reference to the incubators at the Ferguson Brothers Hatchery. It seems by your letter you do not have the details of the matter. The brothers bought the machines and paid $150. They paid no interest at all except $35. The one brother as we learn has left the country, which of itself has violated the contract. The $200 you refer to was not paid. The interest to date would be $150, with the $35 off would be $115. If you would pay the interest and two hundred we might give you an extension, but certainly we cannot let it pass without some money. Yours very truly, Petersime Incubator Company, per Ira M. Petersime."

It will be noted that the letter to plaintiff charged that Talbot was the agent of plaintiff and that he gave the extension as its agent. The reply of plaintiff to this letter did not deny that Talbot was agent. The only denial was that the $200 had been paid. No doubt the jury considered this feature of the letters when deciding whether Talbot actually was a general agent of plaintiff. Surely if he had not possessed authority to make the contract spoken of in the letter to plaintiff that fact would have been denied in the plaintiff's reply. There is more evidence than has been detailed here on the question of agency, but it is not deemed necessary to set it out in this opinion.

Plaintiff next argues that there was no consideration to support the extension agreement. The record discloses that the machines were worth more than the balance due on them. Had defendant not paid the $200 he would have been relieved of all liability on the notes. Apparently something led plaintiff to believe that it was better to accept the $200 payment than to repossess them and try to sell them later. Defendant testified as follows:

"I would not have paid this $200 in cash if I had had any idea they were going to take the machines away from me the same month. I could have bought other machines to replace them with that amount as a down payment."

Under all the circumstances we conclude there was ample consideration to support the extension agreement.

In the case of *Bank v. Coerber,* 113 Kan. 498, 215 Pac. 285, this court held that the implied promise of the maker of a note to continue the payment of interest until the extended date was a sufficient consideration for the promise of the payee to forbear action for the period of the extension. The court said:

"The answer, having been challenged only by a motion for judgment made after the case had been called for trial, must be interpreted liberally in favor of the pleader. So construed it sufficiently alleges not merely that the parties agreed that the note should be extended, but that an extension of time was actually accomplished by the oral agreement, the purpose of the proposed execution of new papers being merely to make the record conform to the fact. Apart from the payment of the money for the revenue stamps and recording fee, the implied promise of the maker to continue the payment of interest until the date named was a sufficient consideration for the promise of the payee to forbear action for the period covered. (*Lorimer v. Fairchild,* 68 Kan. 328, 75 Pac. 124; 8 C. J. 438-9.) This part of the answer therefore stated a good defense on the ground that the action was prematurely brought." (p. 499.)

The plaintiff next argues that there was no meeting of the minds as to the extension agreement, and makes a technical argument for

a limited construction to be placed on the words testified to by defendant. Under all the circumstances we have concluded that the jury was justified in finding that an extension agreement had been made. It would add nothing to this opinion to detail here the evidence on this point.

Plaintiff next argues there was no cause of action proven under the counterclaim. Appellee's cause of action pleaded in his answer was based upon the wrongful *ex parte* appointment of a receiver over the business of defendant, which was obtained on the same day that the previous suit was filed, September 26, 1933, and which was obtained without hearing or notice to defendant. Plaintiff contends that defendant's claim for damages arising out of the wrongful appointment of the receiver is premature for the reason that the suit in which said receivership was obtained is still pending and undetermined and was so at the commencement and trial of the present action.

The fact is that the matter of the appointment of the receiver was settled in that case before this action was begun. The motion to discharge the receiver was made on the ground that it had been obtained by means of false allegations in the petition for a receiver. The motion also pleaded that the receivership action was brought to avoid a replevin suit with its necessity for a bond. The extension agreement was also pleaded. The trial court sustained the motion to discharge the receiver generally. As far as the suit to recover money gradually in that action is concerned, that was abandoned when the present action in replevin and for damages for the retention of the incubators was filed.

Plaintiff argues that the cross petition of defendant was not based upon a counterclaim, but that if it stated a cause of action it amounted to a setoff. R. S. 60-711 defines a counterclaim as "one existing in favor of defendant and against a plaintiff between whom a several judgment might be had in the action, and arising out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim or connected with the subject of the action."

In *Gardner v. Risher*, 35 Kan. 93, 10 Pac. 584, this court held that a claim for unliquidated damages might be set off to defeat a suit in replevin and that if the unliquidated damages amounted to more than the sum due the plaintiff upon which it based its replevin suit that it would entirely defeat the replevin suit and that the defendant might recover a judgment against the plaintiff for the difference.

The court said:

"The law relating to setoffs in this state has been broadened to embrace claims not recognized as such by the laws of many other states." (p. 97.)

In the case of *Miller v. Thayer*, 96 Kan. 278, 150 Pac. 537, this court held that in an action of replevin to recover a stock of goods under a chattel mortgage the defendant mortgagor might set up as a defense and counterclaim a cause of action which had accrued to him on account of fraud practiced on him by the mortgagee when the goods were purchased. In that case this court said:

"If for any reason the indebtedness evidenced by the note does not exist, the plaintiff is not entitled to the possession of the property in controversy under his chattel mortgage. Whatever defeats the note may be set up as a defense to defeat the plaintiff in this action." (p. 280.)

In the case of *Dalsing v. Leib*, 116 Kan. 44, 225 Pac. 1074, this court said:

"The defendant may set forth in his answer as many grounds of defense, counterclaim and setoff for relief as he may have, whether they be such as have been heretofore denominated legal and equitable, or both. (R. S. 60-710.) It would have served no useful purpose to require the defendants to file a separate action to recover damages for breach of plaintiffs' warranty. The spirit of the code favors the settlement, in one action, of different controversies where the circumstances interpose no obstacle." (p. 46.)

The matter pleaded in the cross petition arose out of the transaction involved in the sale of the incubators. It does not appear that the plaintiff was prejudiced by having the issues raised by his cross petition tried in the same action with the replevin action.

Plaintiff next argues that the gist of the cross petition is an action for malicious prosecution, and that since there is no evidence of malice the action must fail. The cross petition was not brought for malicious prosecution, but was for wrongfully procuring the appointment of a receiver. Defendant contended and the trial court found that the plaintiff had no just grounds for obtaining an *ex parte* appointment of a receiver. There was ample evidence to sustain this finding. (See 23 R. C. L. 45; *McKinney v. Nayberger*, 138 Ore. 203, 2 P. 2d 1111.)

Plaintiff next argues that the verdict must of necessity have included items for an attorney's fee of $150 expended in the receivership case, for loss of accounts receivable and for loss of business. The argument is that these are not proper items of damage. The first item of which complaint is made is the attorney's fee. Defendant was compelled to expend this amount to get the receiver,

who had been wrongfully appointed, discharged. It is a reasonable fee and is a proper item of damages. The allowance of the loss in outstanding accounts is the next item of which complaint is made. The record discloses that at the time the receiver took charge the accounts receivable amounted to $400 and that since the receiver was discharged he had only been able to collect $160. Before the receiver was appointed the customers were buying goods and paying for them each month as they could. There was ample evidence that defendant was making a living at this. It can readily be seen that the appointment of a receiver would soon give the customer the idea that it was not necessary to keep his bill paid at the business of plaintiff in order to be able to buy more goods there. This is the way a small business is built up. The business was practically destroyed. The item of accounts receivable was one of the things lost by defendant when that destruction occurred. There are other errors argued in the brief of appellant, but they are not deemed of sufficient importance to discuss here.

The judgment of the trial court is affirmed.