## ANHEUSER–BUSCH, Inc., v. GROVIER-STARR PRODUCE CO.

### No. 2391.

Circuit Court of Appeals, Tenth Circuit.
April 24, 1942.
Rehearing Denied June 3, 1942.

148

Claude I. Depew, of Wichita, Kan. (W. E. Stanley and Lawrence Weigand, both of Wichita, Kan., and Dwight D. Ingamells, of St. Louis, Mo., on the brief) for appellant.

W. L. Cunningham, of Arkansas City, Kan., and J. N. Tincher, of Medicine Lodge, Kan. (Clyde Raleigh and Leaford F. Cushenbery, both of Hutchinson, Kan., and D. Arthur Walker and Wm. E. Cunningham, both of Arkansas City, Kan., on the brief), for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Based upon the breach of an alleged oral contract, whereby the appellee (herein called Grovier-Starr), became the wholesale distributor for the products of the appellant (herein called Anheuser-Busch), as long as Anheuser-Busch manufactured beer and Grovier-Starr faithfully performed its services in business, Grovier-Starr recovered a judgment for $50,019.43 in the District Court of Kansas, Anheuser-Busch has appealed.

Anheuser-Busch denied the existence of a contract as alleged or the authority of its agent to make the same on its behalf, but admitted that on the date mentioned in the complaint it entered into an arrangement with Grovier-Starr, by which it agreed to and did sell to Grovier-Starr its products for purposes of resale in the designated territory on an order-to-order and day-to-day basis, and only so long as the arrangement was mutually satisfactory between the parties, terminable at will by either party. By motion for summary judgment, Anheuser-Busch contended that if a contract was entered into on the date and as alleged by Grovier-Starr, the same was modified during the latter part of 1935 by another oral agreement whereby Grovier-Starr was allotted additional territory known as the Dodge City Territory on the same terms and conditions as the original contract, and again modified in May 1937 by letter written to and accepted by Grovier-Starr, whereby certain counties originally allotted and designated as the Hutchinson-Great Bend Territory were eliminated from the arrangement and additional counties tributary to the Dodge City Territory were added, which arrangement or agreement specifically provided for an order-to-order and day-to-day relationship, terminable at will by either party. No order or judgment was entered on the motion for summary judgment.

The detailed facts are essential to the proper consideration of the legal questions involved. For many years prior to the dates herein complained of Grovier-Starr was engaged in the wholesale produce business with its headquarters at Hutchinson, Kansas. It serviced a trade territory which included parts of Western Kansas, Oklahoma and Texas. Soon after the sale of beer was legalized in Kansas, it became the distributor for Blatz beer for several months in the Summer of 1933. In July or August of the same year, E. J. Grovier, as president of the company, addressed a letter to Anheuser-Busch in St. Louis, Missouri, soliciting the distributorship for Budweiser beer in the territory served by Grovier-Starr. The letter was referred to W. L. Suycott, district manager for Anheuser-Busch in the territory serviced by Grovier-Starr, whose duty it was to supervise sales and recommend dealers. Suycott called at the office of Grovier-Starr on or about September 1, 1933. At the ensuing conference with E. J. Grovier, Suycott explained that it would be necessary for Grovier-Starr to stock and sell only Anheuser-Busch products, to maintain year-round service which would require the purchase of additional equipment, the employment of additional salesmen; and the utilization of its cold storage facilities which it then owned and operated in connection with its produce business; to promote the sale of the products in the designated territory by opening new retail outlets, and to install and maintain advertising, all agreeably to the policies and under the supervision of Anheuser-Busch.

Grovier-Starr was favorably located for the needs and purposes of Anheuser-Busch and the prospects were mutually satisfactory. E. J. Grovier testified that after Suycott had explained the requirements and demands of his company, he inquired of Suycott that if Grovier-Starr would stock and handle only Anheuser-Busch products and would purchase additional equipment, hire additional salesmen and adequately provide for the servicing of the territory, what assurance did Grovier-Starr have that the agreement would not be cancelled and the distributorship discontinued, whereupon, according to Grovier, Suycott stated: "You will be here * * * will have the contract for this territory to sell beer as long as we make it and as long as you faithfully perform your services in the business." According to Suycott, he stated that "Anheuser-Busch would furnish them with beer f. o. b. our dock in St. Louis on a car-to-car basis, that the account would be theirs as long as mutually satisfactory and we discussed this. Mr. Grovier asked me if we gave a contract and I said that the account was for as long as it was mutually satisfactory."

Thus is presented clearly the only substantial conflict in the facts which give rise to the controversy. It is established without substantial dispute that Suycott agreed to recommend Grovier-Starr as the exclusive distributor for Anheuser-Busch products for a territory which embraced certain named counties. At the same time Grovier-Starr ordered two car loads of beer, giving its check for the purchase price therefor, to be shipped through a Missouri permit. In a letter dated September 3, 1933, Suycott reported to the office at St. Louis stating that he had called upon Grovier-Starr and had taken "their application for the attached territory, subject to your approval." Nothing was said in this letter concerning the duration of the proposed arrangements. Thereafter Suycott was authorized by the St. Louis office to confirm the appointment and the beer was shipped as ordered. Grovier-Starr "just quit" handling Blatz beer and Anheuser-Busch cancelled out a distributor at Great Bend, Kansas and allotted this territory to Grovier-Starr.

The parties operated under this oral agreement until May 1, 1937, during which time Grovier-Starr devoted its best efforts towards the promotion and sale of Anheuser-Busch products. More than five hundred retail outlets were established and the business was mutually profitable and satisfactory. In 1934, by an oral arrangement, certain counties tributary to Dodge City, heretofore serviced by another distributor, were added to the territory and thereafter serviced by Grovier-Starr. All arrangements or agreements between the parties were oral and it is established without dispute that all other agreements or arrangements which Anheuser-Busch maintained with wholesale distributors throughout the United States, including the seventy-five distributors under the supervision of Suycott, were on an order-to-order and day-to-day basis, terminable at will by either party. It is also established without dispute that such was the general policy of the company and that no representative of Anheuser-Busch had any authority to enter into any arrangement other than on an order-to-order and day-to-day basis.

In March 1937 Grovier-Starr heard "rumors" that Mr. Burdick, representative of Anheuser-Busch and successor to Suycott in this territory, contemplated discontinuing further relations with Grovier-Starr. By telephone it was advised by Burdick that if and when such action was contemplated, it would be informed, and that "Anheuser-Busch did not do business in that way"; nothing was said concerning a permanent or continuous contract. The rumors persisted and in April Grovier and Starr conferred with Mr. Busch, vice-president of the company, in St. Louis. Mr. Busch observed that the business relation had been quite satisfactory and promised to investigate the matter thoroughly. Again, nothing was said between the parties concerning the duration of the relationship. Soon thereafter Burdick informed Grovier-Starr at its office in Hutchinson that he was cancelling the distributorship as of May 1, 1937 and that Mr. Hettinger, a former employee of Grovier-Starr in charge of beer sales, was to be designated as the distributor for the counties embraced within the Hutchinson-Great Bend Territory. Grovier and Starr remonstrated with Burdick and when pressed for his reasons, Burdick answered "well, the only reason I have got is that Hettinger is going to leave you and he is going into business and I don't want him for a competitor." At that time, nothing was said concerning the duration of the original arrangement, neither did Grovier-Starr contend that it had a contract for a distributorship as long as Anheuser-Busch

made beer and it faithfully performed its services in business.

At the same conference, it was agreed that Grovier-Starr would continue as the distributor for the Dodge City Territory with certain named counties added thereto. This territory was far less profitable than the Hutchinson-Great Bend Territory, in fact the Hutchinson-Great Bend Territory was the heart and geographical center of the trade territory serviced by Grovier-Starr, and undoubtedly represented the profitable part of the business. The St. Louis office approved the arrangements for the Dodge City Territory by a letter dated May 5, 1937 in which the arrangements were stated in detail, including a recital, "we shall continue the policy of working with our distributors without entering into any contracts, franchises or continuous relationships, but it will be agreed that our distributors are wholesale dealers in our beers, the relationship to be on the order-to-order basis, and may be abrogated at will either by yourselves or by ourselves. We found this basis of relationship with our distributors happy and most profitable throughout our business history, and have resolved to continue it. * * *" This arrangement was confirmed by Grovier-Starr and they continued to operate under it until the arrangement was discontinued by mutual consent. Again Grovier-Starr was silent concerning any agreement for permanent or continuous relationship. Without further protest, Grovier-Starr continued to operate in the same trade territory as a wholesale produce dealer and as distributor for different brands of beer until it discontinued business in October of 1938, but the beer business in the Hutchinson-Great Bend Territory was not profitable to it because it was unable to convert the retail outlets it had created for Anheuser-Busch to a competitive brand of beer.

It was not until after it had discontinued business in 1938 and had employed counsel that Grovier-Starr informed Anheuser-Busch that it was contending for a contract on any basis other than the agreement outlined in the letter addressed to it by Anheuser-Busch on May 5, 1937.

The trial court found that Suycott was the only agent or representative of Anheuser-Busch who talked with or conveyed any information to Grovier-Starr's officers concerning the agreement; that whatever arrangements were made with Grovier-Starr were made by Suycott who, with the approval of Anheuser-Busch, appointed Grovier-Starr distributor in the designated territory and agreed that Grovier-Starr would be the exclusive distributor for Budweiser beer in the designated territory so long as Anheuser-Busch made beer and the plaintiff faithfully performed its services in business. The trial court concluded as a matter of law that W. L. Suycott had authority from Anheuser-Busch to enter into the contract; that after the termination of the contract on or about May 1, 1937 Grovier-Starr made a new agreement with defendant for the wholesale distribution and sale of Anheuser-Busch products in what is known as the Dodge City Territory; that this agreement was on an entirely different basis and was terminated by mutual consent on or about August 1, 1937. The trial court specifically found that the agreement of May 1, 1937 did not operate to waive any claim which Grovier-Starr had for damages against the defendant by reason of its breach of the alleged original contract of September 1, 1933, and that the said original contract was wrongfully breached by its unauthorized cancellation on May 1, 1937. On the basis of its sales experience and net profits as shown by the record, the court calculated the measure of the damages and rendered judgment therefor.

On appeal, the appellant contends (1) that the findings of the court as to the contract and its duration is clearly erroneous; (2) Suycott had no authority to bind Anheuser-Busch by an agreement giving Grovier-Starr exclusive sale of its beer as long as Anheuser-Busch made beer and Grovier-Starr faithfully performed its services; (3) the contract as contended by Grovier-Starr and as found by the court was terminable at will by either party as a matter of law and unenforceable because of lack of mutuality; and (4) the alleged contract of September 1, 1933, was rescinded and mutually abandoned as to duration and extent of territory by agreement of May 5, 1937.

While Suycott testified that he represented to Grovier-Starr that "the account would be theirs as long as mutually satisfactory," and that he had no authority to bind his principal to any other agreement, Grovier testified that Suycott promised them that the designated territory would be theirs as long as Anheuser-Busch made beer and they faithfully performed.

their services in business. The trial court resolved the conflict in favor of Grovier-Starr and his findings thereon, supported by direct testimony of E. J. Grovier, are not clearly erroneous and we are not warranted in taking a contra view of it. Therefore in the consideration of the legal question presented, we shall proceed on the factual assumption that Suycott, as district manager for Anheuser-Busch, did make representations in accordance with the testimony of E. J. Grovier, and as found by the trial court.

We think, however, that we must also assume that Suycott, as the known agent and representative of Anheuser-Busch, had no authority to recommend Grovier-Starr as wholesale distributor for the designated territory on any other than a day-to-day and order-to-order basis, and so long as mutually satisfactory, terminable at will by either party. Moreover, any other basis was not only foreign to the authority and instructions of Suycott but foreign to the established business policies of Anheuser-Busch. It is also unmistakably clear from the whole record that Suycott did not advise his principal when recommending Grovier-Starr as distributor that the proposed arrangements were otherwise than the usual and ordinary arrangements which Anheuser-Busch maintained with approximately one thousand other wholesale dealers throughout the United States, approximately seventy-five of which had been recommended by Suycott. This fact is implicit in his letter of September 3, 1933, addressed to his principal, in which Suycott gave an account of the transaction. Furthermore, it is equally clear that if Anheuser-Busch had known of the unusual and unique aspects of the proposed arrangement, it would have disaffirmed any contract binding it on the terms contended for by Grovier-Starr and as found by the court. It should be noted here that such a contract is in the nature of things not only unique and unusual, but one not lightly bestowed or readily inferred from an oral conversation between an agent and a third party.

In this posture, our question is narrowed to the premise that Suycott, as the known agent of Anheuser-Busch, had actual authority to recommend wholesale distributors, and when his recommendation was approved by the St. Louis office, there was constituted a legal relationship between his principal and the third party, the nature of which is measured and governed by his actual or apparent authority. There was a manifestation or holding out by Anheuser-Busch that Suycott had authority to appoint a distributor in accordance with the usual and ordinary course of business and to bind his principal by acts done and committed within the scope of such authority. Suycott did negotiate with Grovier-Starr with actual authority to make recommendations for a distributorship and with the approval of the St. Louis office to enter into an arrangement with Grovier-Starr whereby it would become the wholesale distributor of its products in a designated territory on an order-to-order and day-to-day basis. Instead, according to the findings of the court, binding here, he agreed with Grovier-Starr in substance that he would recommend it as a wholesale distributor in the designated territory as long as Anheuser-Busch made beer and it faithfully performed its services in business, which representations were not within the knowledge of Anheuser-Busch at the time it confirmed the arrangements or at any time thereafter during the course of dealings between the parties. It must be conceded therefore that Suycott had no actual authority to make the contract which the trial court has found to exist.

■ Grovier-Starr contends that Suycott was the general agent for Anheuser-Busch and seeks to predicate his authority to bind his principal on the theory of general agency. Kansas adheres to the general rule that a general agent, unless he acts under a special and limited authority, impliedly has power to bind his principal by whatever is usual and proper to effect such a purpose as is the subject of his employment, and in the absence of known limitations third persons dealing with such a general agent have a right to act on the presumption that the scope and character of the business he is employed to transact measures the extent of his authority, and to hold the principal responsible for the agent's acts within such authority. Aultman Threshing & Engine Company v. Knoll, 71 Kan. 109, 79 P. 1074; Hornick v. Union Pac. R. Co., 85 Kan. 568, 118 P. 60, 38 L.R.A., N.S., 826, Ann.Cas.1913A, 208; Townsend v. Missouri Pac. R. Co., 88 Kan. 260, 128 P. 389; Wilson v. Haun, 97 Kan. 445, 155 P. 798; Siedhoff v. Campbell, 141 Kan. 255, 40 P.2d 404; Petersime Incubator Co. v. Ferguson, 143 Kan. 151, 53 P.2d

505, 507; Restatement of Law of Agency, Sections 8 and 43. The authority of Suycott as agent of Anheuser-Busch is composed of his actual authority, shown here to exist together with the implied, apparent, or ostensible authority which Anheuser-Busch by its conduct precludes itself from denying. Truscon Steel Company v. Cooke, 10 Cir., 98 F.2d 905, 909; Reser v. Southern Kansas Mutual Insurance Co., 150 Kan. 58, 91 P.2d 25, 29; Siedhoff v. Campbell, supra. We think it unnecessary to determine whether in the premises Suycott was the general or special agent of Anheuser-Busch; he was the representative of Anheuser-Busch, clothed with the authority to recommend and, with the approval of his principal, to appoint a wholesale distributor for its products in his territory. It must be assumed therefore that he impliedly had power to bind his principal by whatever is usual and proper and to effect the purpose indicated by the subject of his employment. Siedhoff v. Campbell, supra; 2 C.J.S., Agency, § 101, p. 1233 et seq.

■ The Supreme Court of Kansas in Siedhoff v. Campbell, supra, and this court in Berryhill v. Ellett, 10 Cir., 64 F.2d 253, 255, have adopted and applied the abstract rules governing the actual, implied, apparent and ostensible authority of an agent to bind his principal announced in Restatement of Law on Agency (Sections 8, 35, 39, 51, 140, 144, 161 and 198). As observed in Berryhill v. Ellett, supra, "the expression apparent authority is not one of fixed meaning. It is used in legal literature in different senses. Mechem on Agency, 2d Ed., Sec. 720." It is settled that if a principal manifests to a third person that the agent is authorized to conduct a transaction, there is apparent authority in the agent to conduct it in accordance with the ordinary usages of business and to do the incidental things which ordinarily accompany the performance of such transaction, unless the third person has notice that the agent's authority is limited. Restatement of Law of Agency, § 49; Siedhoff v. Campbell, supra; Berryhill v. Ellett, supra.

■ When liability is enforceable because of the apparent or ostensible authority of an agent having no authority, it is based primarily upon the rules of estoppel, Continental Oil Co. v. Baxter, Tex.Civ.App., 59 S.W.2d 463; 2 C.J.S., Agency, § 96, p. 1208, an essential ingredient of which is knowledge on the part of the principal of the facts on which the third party relies. An agent is acting within the apparent scope of his authority, and his principal is bound by his acts, only when a reasonably prudent person having knowledge of the usage of the business in which the agent purports to act would be justified in believing from the character of the agent's known duties that the agent is authorized to perform such act. Berryhill v. Ellett, supra; Siedhoff v. Campbell, supra; Townsend v. Missouri Pac. R. Co., supra. Thus it is manifest that Suycott as the known agent of Anheuser-Busch had apparent authority to consummate, with the approval of the company, an agreement whereby Grovier-Starr would become the wholesale distributor for the products of Anheuser-Busch in a designated territory in accordance with the usual and ordinary policies commonly employed in the effectuation of such relationships, and Anheuser-Busch was bound by the acts of its agent committed not only within the scope of his actual authority, but within the scope of his apparent authority as measured by usages and policies peculiar to such business. In the effectuation of this relationship, and in its course of dealings with Suycott, Anheuser-Busch was required to exercise reasonable care not to mislead or deceive the third party in its manifestations to the third party concerning the authority of its agent. See 2 C.J.S., Agency, § 96, p. 1205.

■ Likewise, Grovier-Starr may not impose in the agent a blind confidence without the exercise of good faith or reasonable prudence, and if business usage applicable to the particular business indicates to a reasonable person that the agent is not acting within the scope of his apparent or ostensible authority, it is the duty of the third person to make inquiry concerning the scope of his authority. Mechem on Agency, 2d Ed. § 788. If the third party knows, or has good reason for believing, that the acts exceed the agent's powers, or if such reasonable inquiry as he is under the duty to make, would result in a discovery of the true state of the powers, and he fails to fulfill that duty, he cannot assert an apparent authority effective against the principal. 2 C.J.S., Agency, § 96, p. 1218. American National Bank of Sapulpa v. Bartlett, 10 Cir., 40 F.2d 21; Mechem on Agency, 2d

Ed. Sec. 752; Brownell v. Tide Water Associated Oil Company, 1 Cir., 121 F.2d 239, 244.

■ Here the alleged contract was unusual, unique and unreasonable as to its duration, and not reasonably within the contemplation of Anheuser-Busch by its manifestations of authority to Suycott or third persons, and we do not think that Anheuser-Busch by its affirmance and acquiescence, without knowledge of its duration, could have reasonably supposed that such a contract had been consummated by its agent. Moreover, it seems equally plain that Grovier-Starr, in the exercise of reasonable care and prudence, should have known of the limitations upon the authority of Suycott to effect a contract which, when considered in the light of business usages, was unusual and extraordinary. When its continuance was threatened and Grovier-Starr was attempting to maintain the relationship, it did not speak to anyone concerning its duration; when the relationship was discontinued or modified in May, 1937, it remonstrated but did not contend to anyone that Anheuser-Busch had no authority to abrogate the relationship. It continued to operate under a modified or, as the court found, a new contract whereby it retained certain territory until the relationship was discontinued by mutual consent. It did not speak until its lawyers spoke for it after it had discontinued business. Moreover, it is fairly inferable from the record that other distributors operating in the territory allotted to it were cancelled out apparently without notice. Grovier-Starr was undoubtedly apprised of the usages and customs of the business. We hold that Suycott had no actual or apparent authority to make the contract contended for by Grovier-Starr and as found by the court, and no liability can attach to Anheuser-Busch under it.

Having determined the non-liability of Anheuser-Busch under the contract, it is unnecessary for us to notice the other points raised and discussed by the parties. The arbitrary conduct of Anheuser-Busch is not to be condoned, but we are not asked to determine its liability based upon an arbitrary discontinuance of the arrangement, except insofar as it constitutes a breach of a continuous and uncancellable contract.

The judgment of the trial court is reversed.

BRATTON, Circuit Judge (dissenting).

Grovier-Starr Produce Company was a reputable company, engaged in the wholesale fruit and vegetable business. Its headquarters were in Hutchinson, Kansas; it had warehouses at Great Bend, Larned, Dodge City, Liberal and Wichita; it had about twenty-five trucks practically all of which were equipped for cooling; and it had about one hundred employees. In 1933, it wrote Anheuser-Busch, Incorporated, at Saint Louis, Missouri, seeking to become wholesale distributor for Budweiser beer in its trade territory. W. L. Suycott, district manager of Anheuser-Busch in Oklahoma, Western Kansas, and the Panhandle of Texas, made an investigation of Grovier-Starr with respect to its financial strength, its promptness for paying bills, and its warehouse and truck facilities. He went to its place of business in Hutchinson, and there met E. J. Grovier, Sr., E. J. Grovier, Jr., and an employee named Hettinger. Negotiations were begun in respect to the agency. E. J. Grovier, Sr., testified that an oral agreement was entered into which provided that Grovier-Starr should become the wholesale distributor of Budweiser beer in a specified trade territory, that it should not handle any other brand of beer, that it should terminate its existing agency for Blatz beer, that it should employ some additional salesmen exclusively for beer, that it should push the business, and that the contract should continue in force and effect as long as Anheuser-Busch manufactured beer and Grovier-Starr faithfully performed its services in connection with the business. It was stipulated that E. J. Grovier, Jr., would testify substantially the same with reference to the terms of the contract. Suycott testified that the territory was discussed, and he explained the necessity of Grovier-Starr terminating its existing agency for Blatz, that he advised the Groviers that he could only make a recommendation to the home office of Anheuser-Busch and that final action on the application for the agency would have to be made there, that he made a favorable recommendation, and that it was approved. He denied that he said the contract should continue to be in force and effect as long as Anheuser-Busch made beer and Grovier-Starr faithfully performed its services in connection with the business. On the contrary, he testified that he said the agreement should continue in force as long as it was mutually satisfactory to both parties. Hettinger testified that he was not present

during all of the negotiations, and that he did not hear Suycott say Grovier-Starr was to have the agency as long as Anheuser-Busch made beer. A written report which Suycott made to his company respecting the establishment of the agency was silent as to duration. Manifestly the evidence presented a sharp issue of fact as to whether a verbal contract was entered into at Hutchinson in which it was provided that the agency should continue in force and effect as long as Anheuser-Busch · should manufacture beer and as long as Grovier-Starr should faithfully perform its services in connection with the business. But in a case of this kind where a trial by jury has been waived contradictions and conflicts in the evidence are for the trial court, not the appellate court. The trial court determined the issue against Anheuser-Busch. It was expressly found that the contract was entered into and that it did contain such a provision. The finding is abundantly supported by substantial evidence and is not clearly erroneous, due regard being given to the opportunity of the court to observe the witnesses while testifying, judge of their credibility, and determine the weight to be given to their testimony. The finding should therefore stand undisturbed on appeal. United States v. McCain, 10 Cir., 118 F.2d 479; Sauder v. Dittmar, 10 Cir., 118 F.2d 524; Thermopolis Northwest Electric Co. v. Ireland, 10 Cir., 119 F.2d 409; Thatenhorst v. United States, 10 Cir., 119 F.2d 567; Scott v. Beams, 10 Cir., 122 F.2d 777; American Employers' Ins. Co. v. Raton Wholesale Liquor Co., 10 Cir., 123 F.2d 283; Dye v. United States, 10 Cir., 123 F.2d 385; Hartford Accident & Indemnity Co. v. City of Sulphur, Okl., 10 Cir., 123 F.2d 566.

Anheuser-Busch challenges the authority of Suycott to enter into such a contract with binding effect upon it, and the majority sustain the challenge. Suycott was district manager in a territory covering parts of three states. His duties concerned themselves primarily with matters relating to the establishment of wholesale agencies for the company. August A. Busch, Jr., and Suycott each testified that the latter did not have authority to create agencies, and that his authority was limited to making recommendations for approval at the home office in Saint Louis. But at another place, Busch testified:

"Q. What did Mr. Suycott report about it? A. To me, nothing. He reported to the other gentlemen.

"Q. Well, what was the report you finally got about it? A. That Grovier-Starr were appointed wholesalers just like anybody else.

"Q. That is what he reported? A. Yes, appointed wholesalers.

"Q. In what territory? A. In what territory? In the territory allotted to them by Mr. Suycott.

"Q. That is, Suycott appointed them wholesalers in the territory allotted by Suycott? A. That is correct."

And at a different place in the course of the examination, Suycott testified:

"Q. About how many distributors would you say that you appointed for Anheuser-Busch in 1933, 1934, 1935 and 1936, or thereabouts? I think that was the period of time you covered the Kansas territory? A. In Kansas or everywhere?

"Q. Everywhere. A. I would say seventy, probably between seventy and eighty; maybe ninety.

"Q. All of those were oral contracts, were they not? A. No sir, there was no contract.

"Q. Well, I should say your agreement, if you wish to call it that, was oral, by word of mouth? A. All agreements were oral. The company adopted the policy of sending a written letter or written contract or confirmation in 1937 or 1938."

Furthermore, in Kansas, even though there be limitations on the authority of an agent, as between the principal and a third party, the principal is bound by the contract of the agent made within the apparent scope of the authority of the agent, unless the third party has knowledge of the limitations. Aultman Thrashing & Engine Co. v. Knoll, 71 Kan. 109, 79 P. 1074; Townsend v. Missouri Pac. R. Co., 88 Kan. 260, 128 P. 389. And where an agent is held out to the world as having the authority of a general agent and a third party in good faith and without negligence deals with him, the principal cannot thereafter be relieved of liability on the ground that the agent overstepped the limitations imposed upon his authority. Hyson v. Bankers' Mortgage Co., 136 Kan. 259, 14 P.2d 726; Petersime Incubator Co. v. Ferguson, 143 Kan. 151, 53 P.2d 505. The provision in the contract in respect of duration was not necessarily so unique or unreasonable as to take the case out of these established principles.

A contract to be binding and enforceable must contain mutual or reciprocal obliga-

tions. Fitzstephens v. Whan, 113 Kan. 650, 216 P. 269; Van Deren v. Heineke & Co., 122 Kan. 215, 252 P. 459; Swart v. Huston, 154 Kan. 182, 117 P.2d 576. But it is not essential to mutuality that duration be specified by calendar dates. It may be fixed by reference to acts or events. While there are cases announcing a contrary rule it is my view that the contract between these parties was not so completely lacking in mutuality that no recovery of damages can be had for its breach. Kaufman v. Farley Manufacturing Co., 78 Iowa 679, 43 N.W. 612, 16 Am.St.Rep. 462; Kelly-Springfield Tire Co. v. Bobo, 9 Cir., 4 F.2d 71, certiorari denied 268 U.S. 694, 45 S.Ct. 513, 69 L.Ed. 1161.

Acting in reliance upon the contract, Grovier-Starr gave up its agency for Blatz beer, employed additional salesmen and other personnel, bought additional trucks and other equipment, and incurred and defrayed other large expenses. It created about 542 retail outlets in the trade territory; its distribution of Budweiser beer to such retail dealers during the last four months in 1933 amounted to $6,484.70; in 1934, $98,093.36; in 1935, $111,932.55; in 1936, $316,777.55; and during the first four months in 1937, $118,085.30; and its net profit for the year ending May, 1937, was $41,000. Its accounts to Anheuser-Busch were paid promptly, no complaint was registered as to the volume of sales or the manner in which the business was being conducted, on the contrary approval was voiced. Hettinger left the employ of Grovier-Starr on April 1, 1937, for the purpose of entering the wholesale beer business on his own behalf. Despite the manner in which Grovier-Starr had faithfully performed the contract on its part, Burdick, who had succeeded Suycott as district manager in that area, advised Grovier-Starr that the contract would be terminated on May first. The secretary of Grovier-Starr testified that Burdick told him and E. J. Grovier, Sr., that he was going to break the contract with them and give it to Hettinger, that he was going to cancel it and give it to Hettinger, and that the reason for doing so was fear of Hettinger as a competitor. And Burdick testified that in his opinion Hettinger was the only one connected with Grovier-Starr actively engaged in the beer business, and that in view of his resignation it was decided to eliminate Grovier-Starr as a distributor. I

think the contract was valid, the breach was wrongful and wanton, the damages awarded were reasonable in amount, and the judgment should be affirmed.