No. 32,028

GEORGE H. SIEDHOFF, *Appellee*, v. ROBERT CAMPBELL et al., *Defendants;* CHARLES F. SMYTH and ANNA M. SMYTH, Executrix of Last Will and Testament of Charles H. Smyth, Deceased, *Appellants.*

(40 P. 2d 404)

Opinion filed January 26, 1935.

*W. D. Jochems, J. Wirth Sargent, C. Edward Murray* and *Emmett A. Blaes,* all of Wichita, for the appellants.

*Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs* and *R. H. Nelson,* all of Wichita, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action to compel performance of certain provisions contained in a contract for the sale of corporate stock.

Although the action was against a number of defendants, judgment was rendered only against Chas. H. Smyth and Chas. F. Smyth. Chas. H. Smyth died, and the action was revived against his executrix, and she and Chas. F. Smyth appeal. For convenience the terms appellants or defendants will be used. In order to avoid prolixity of statement, reference to matters not essential to this appeal will be avoided as much as possible.

The petition alleged the making of a contract between plaintiff and one Campbell on behalf of appellants Smyth and Smyth, reciting in part;

"Witnesseth: That first party agrees to sell to second party 125 shares of common stock of The Hartman Theatre Company for............................dollars and 125 shares of preferred stock of The Hartman Theatre Company for sixteen thousand and no/100 dollars, to be paid as follows: One thousand and no/100 dollars ($1,000.00) cash, receipt of which is hereby acknowledged by first party, the balance of the purchase price of said common stock to be paid on or before Thursday, September 6, 1928. The purchase price of said preferred stock is to be paid on or before October first, 1928. *All bills to be paid in cash by the 6th of September.*

"Second party agrees to purchase said stock on the terms above stated.

"In Testimony Whereof, we have hereunto set our hands this first day of September, 1928.

(Signed)  GEO. H. SIEDHOFF.
(Signed)  ROBERT CAMPBELL."

That at the time of making the contract it was the understanding that the phrase "All bills to be paid in cash by the 6th of September" meant that all bills and outstanding obligations of the theater company should be paid by the purchasers of the stock so that plaintiff would be relieved of obligation thereon; that plaintiff had been liable in person, and in making the sale of his stock severed his connection with the company and the parties intended plaintiff should be relieved; that plaintiff had performed his part, but defendants, undisclosed principals at the time of the making of the contract, had not. A schedule of bills totaling $6,416.54 was attached. The prayer was that defendants be required to pay the listed bills and that plaintiff have judgment for the sum of $6,416.54 and interest and costs, etc.

The verified answer of the Smyths may be summarized as denying the authority of their agent Campbell to make a contract binding them to pay the bills, and if it be found he did make any such contract without authority, they rescinded such contract and offered return of the stock, and asked return from plaintiff of the moneys paid for the stock.

Plaintiff's reply need not be noticed here.

Although an equitable action, a jury was called in an advisory capacity. Its findings will be referred to in connection with certain claims of error.

The controversy arose out of the erection of a theater by the Hartman Theatre Company. The theater was built by the Siedhoff Construction Company, of which the plaintiff was president and principal shareholder. At the time of the contract for sale of stock here involved, the theater company was indebted for construction bills and perhaps other accounts. Differences arose in the theater company and the stockholders fell into two groups; in one were the plaintiff Siedhoff, a Mr. Workman and a Mr. Stockman; in the other were the appellants and others. The company had a capital stock of $150,000 composed of $75,000 common and $75,000 preferred shares, the preferred shares being secured by an indenture to the Guarantee Title & Trust Company, with which the defendant Robert Campbell was connected. The above facts seem to be undisputed. The court made no findings of fact, and with the exception of the answers of the jury to special questions, we are without benefit of any finding except such as inheres in the court's judgment in favor of the plaintiff. There was testimony

that on July 18, 1928, there was a meeting of the board of directors at which Mr. Siedhoff stated that $19,000 would pay all bills contracted, and a loan was made for $15,000. The amount was insufficient, and it later developed that it was advisable for one group to buy out the other. Although not then known to Siedhoff and his associates, the Smyths made a written agreement with Campbell to acquire the Siedhoff, Hartman and Stockman stock and authorized payment of fifty cents on the dollar for the common and par for the preferred stock. On September 1, 1928, Campbell made contracts with Hartman and Stockman for purchase of their shares, using the same form as quoted above except that no provision for payment of bills was inserted.

Although the petition alleges that Campbell was acting for undisclosed principals, Siedhoff testified that in his dealings with Campbell he knew whom he represented on September 1, 1928, when the quoted contract was made. Preliminary to the contract, Siedhoff stated if a loan of $30,000 was made, it would pay all the construction bills, and Campbell called Mr. C. H. Smyth, who agreed to make the loan. This loan was subsequently made and Siedhoff was paid $23,941.40. Just why the balance of the bills was not paid does not clearly appear. Siedhoff claimed he was personally responsible for the payment of these bills, and he insisted on the insertion of the claim: "All bills to be paid in cash," etc., and wrote it into the contract himself. We shall not discuss Siedhoff's subsequent execution of notes as an officer of either the construction company or the theater company, nor the payment on the bills by the construction company or by Siedhoff individually. About November 23, 1928, Siedhoff, Hall, C. H. Smyth and perhaps others conferred concerning these bills, and Siedhoff wanted Hall to guarantee payment. The contract relied on here does not · seem to have been mentioned. After some conversation, Siedhoff and Smyth agreed that if Hall did not pay, the two would pay them fifty-fifty. We are not concerned with that agreement, for it is not the one sued on, although for some reason the court submitted a question to the jury thereon.

During the course of the trial there was testimony to which appellants objected, concerning the meaning of the inserted clause with reference to payment of bills, and what was intended. The clause was ambiguous, and the testimony was proper. There was also testimony about the various meetings mentioned, what was

said and done, etc. At the conclusion the court refused to give appellants' requested instructions or to submit their requested special interrogatories, and instructed the jury, and submitted to it eight questions, the answers to which, in substance, were:

1. That when Campbell executed the contract it contained the words "All bills to be paid in cash by the 6th of September."

2. That Siedhoff and Campbell understood what they meant and that was Smyth and Smyth were to pay.

3. That Campbell was not acting for himself, but was acting for Smyth and Smyth.

4. That Siedhoff exercised reasonable care and prudence concerning Campbell's power to deal in the matter and was justified in believing Campbell had authority.

5. That Charles H. Smyth later told Siedhoff if he would not file mechanic's liens he would go fifty-fifty on the bills.

6. That Campbell's copy of the contract, which had the clause "All contractor's bills to be paid in ten days or earlier," was executed by Siedhoff and Campbell and referred to the contractor's bills, and it was understood Smyth and Smyth were to pay them.

7. Siedhoff was to receive all bills due him, including the subcontractor's bills, out of the $30,000 loan, and

8. At the time of signing the above contracts Siedhoff knew from the facts and circumstances for whom Campbell was acting.

The court denied appellants' motions to set aside answers, to grant a new trial and for judgment on the special findings, and rendered judgment for plaintiff.

There are many specifications of error, but we shall concern ourselves first with the one that the court erred in holding there was any evidence of authority in Campbell to bind appellants for the bills referred to in the plaintiff's petition. It has been noted that Siedhoff had no knowledge of Campbell's written authority. Campbell testified he had no other or further authority, as did Smyth and Smyth. It is clear from the special question 4 submitted that the court believed that the issue was whether Campbell had apparent authority. During his opening statement, appellant's counsel said that Campbell, who was an officer of the Guarantee Title & Trust Company, had no personal interest, but was acting as agent, that he owned no stock in the theater company, and that he had no interest except to see the bills were paid and the mortgage lien protected;

that Smyths knew nothing about the contract and they never authorized Campbell to bind them to pay the bills. Later plaintiff's counsel insisted an admission of general agency was made, and this was denied. At other times the extent of the admission was referred to, and the statement made that if appellants' counsel had inadvertently made admission of general agency they wished to withdraw it. It is also insisted such an admission is made in the briefs. As some of the court's rulings seem to indicate it thought a general admission was made, we have examined the abstracts and briefs particularly and conclude there was not, even in the first instance, any admission of general agency.

The court submitted a question to the jury that if they found Campbell was acting as agent then state:

"(a) Whether Siedhoff exercised reasonable care and prudence concerning Campbell's power to deal in the matter, and

"(b) Whether under all the facts and circumstances in this case Siedhoff was justified in believing that Campbell had authority to sign a contract for his principal or principals."

To which affirmative answers were given. Assuming the questions, under the instructions, called for answers of fact and not conclusions of law, was there any evidence to support them?

Certain observations may be made. It is admitted that although not then known to Siedhoff, the actual authority of Campbell to purchase was limited. It is not claimed that Campbell had previously represented the appellants in the purchase of stock or any other property. It is not usual for the purchaser of corporate stock to agree, as a part of the purchase price thereof, to pay the corporate debts. At the very time the purchase agreement was made, the corporation made a loan to raise funds to pay the questioned bills and Siedhoff received payment of about $23,000.

In the recently published Restatement of Agency will be found the following:

"§ 8. *Apparent Authority.* Apparent authority is the power of an apparent agent to affect the legal relations of an apparent principal with respect to a third person by acts done in accordance with such principal's manifestations of consent to such third person that such agent shall act as his agent."

"§ 35. *When Incidental Authority is Inferred.* Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it."

"§ 39. *Inference that Agent is to Act for Principal's Benefit.* Unless other-

wise agreed, authority to act as agent includes only authority to act for the benefit of the principal."

"§ 51. *Authority Inferred from Authorizing Making of Contract.* Unless otherwise agreed, authority to ·make a specified contract includes authority: (*a*) to make it in a usual form and with usual terms or, if there are no usual forms or terms, in an appropriate way; and (*b*) to do other acts incidental to its making which are usually done or which, if not usually done, are reasonably necessary for making it."

"§ 140. *Liability Based upon Agency Principles.* The liability of the principal to a third person upon a transaction conducted by an agent, or the transfer of his interests by an agent, may be based upon the fact that: (*a*) the agent was authorized; (*b*) the agent was apparently authorized; or (*c*) the agent had a power arising from the agency relationship and not dependent upon authority or apparent authority."

"§ 144. *General Rule.* A disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his authority if made in proper form and with the understanding that the principal is a party."

"§ 161. *Unauthorized Acts of General Agent.* A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which he is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that the agent is not so authorized."

"§ 198. *Contract Unauthorized in Part.* If an agent having the power to bind an undisclosed principal by certain terms in a contract makes a contract including such terms and also other terms which are beyond the power which he has to bind the principal, the principal is not liable either upon the contract as made or upon the contract with the additional terms omitted."

## In 21 R. C. L. (Principal and Agent, § 32), p. 853, is the following:

"There is a marked distinction between the power and authority of a general and a special agent to bind his principal. A general agent is usually authorized to do all acts connected with the business or employment in which he is engaged, while a special agent is only authorized to do specific acts in pursuance of particular instructions, or with restrictions necessarily implied from the act to be done."

## And in the same text, section 34, page 854, it is said:

"The liability of the principal is not limited to such acts of the agent as are expressly authorized or necessarily implied from express authority. All such acts of the agent as are within the apparent scope of the authority conferred on him are also binding upon the principal, apparent authority being that which, though not actually granted, the principal knowingly permits the agent to exercise, or which he holds him out as possessing. . . Apparent authority may be and often is derived from a course of dealing, or from a number of acts assented to or not disavowed. . . Indeed, whenever a principal has placed an agent in such a situation that a person of ordinary prudence, con-

versant with business usages, and the nature of the particular business is justified in assuming that such agent is authorized to perform in behalf of his principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it. . ."

Although there has been some criticism of the use of the terms "general agent" and "special agent" with respect to dealings with third persons (2 C. J. "Agency" § 221, p. 580), it is said at page 583, section 223, that—

"It is a general rule that the authority of a special agent must be strictly pursued, and this authority must be limited to the particular business and particular instructions given, and the agent cannot, by mere silence as to limitations of authority, render them ineffective. Persons dealing with such an agent must at their peril inquire into the nature and extent of his authority and deal with him accordingly, for as in the case of acts and transactions of a general agent, a special agent cannot bind his principal by acts outside the scope of his authority, except perhaps, where the principal's own negligence has enabled the agent to perpetrate a fraud thereby, and it has been held that the act of a special agent outside of his authority is voidable at the option of the principal. A special authority, like a general authority, confers by implication all powers necessary for or incident to its proper execution, and acts done by a special agent while acting within the scope of his authority are as binding on the principal as those of a general agent."

In *Bohart v. Oberne,* 36 Kan. 284, 13 Pac. 388, defendants were engaged in the hide and wool business at various places, their agent at Kansas City being one Eldridge, who had made advances to certain sellers, which practice was ordered stopped. The instruction was violated and further advances made. To settle the account, the sellers and the agent executed an agreement conveying fixtures and accounts of a meat market to defendant. Later the meat-market fixtures and accounts were sold by the agent to plaintiff under an agreement to protect against claims against the property, the agreement being signed by defendants by Eldridge as manager. Plaintiffs sued to recover on the agreements as to the accounts. In disposing of the proposition of authority of the agent, it was said:

"John Eldridge was the agent of the defendants, and the extent of his authority was to purchase hides, wool, furs, and tallow, and to pay for the same with the funds furnished by the defendants. The power conferred did not authorize him to loan or advance the moneys of the defendants to their customers and others, nor to sell the property and accounts that he received in satisfaction of the unauthorized advances which he had made, much less to guarantee the payment of such accounts. His power was special and limited, and one to be strictly pursued, and the plaintiffs were bound at their peril to know the extent of his authority. Speaking generally, it

may be said that the power given to an agent in such cases includes with it the authority to do whatever is usual and necessary to carry into effect the principal power conferred, but bartering in the property and fixtures of a meat market, and in the unsettled accounts of its former proprietor, was not incidental to the power conferred on Eldridge, nor necessary for its execution. It was outside of the apparent scope of his agency, and the facts in the case fairly justify the finding that the plaintiffs were chargeable with notice that Eldridge acted in excess of his authority." (p. 289.)

And see the above case on what constitutes ratification.

In *Sullivant v. Jahren*, 71 Kan. 127, 79 Pac. 1071, it was held a real-estate agent "is a special agent and must pursue his instructions and act within the scope of his limited powers, and those who deal with him, if he exceeds his authority, do so at their peril." (Syl. ¶ 1.)

In *Peddicord v. Berk*, 74 Kan. 236, 84 Pac. 465, it was held that—

"Authority to an agent to rent land does not authorize him to contract for the erection of buildings or the making of improvements." (Syl. ¶ 3.)

And in *Brown v. Gilpin*, 75 Kan. 773, 90 Pac. 267, it was held that correspondence between a principal and agent looking to a sale of land did not authorize the agent to make a written contract in the name of his principal.

In *Hornick v. U. P. Railroad Co.*, 85 Kan. 568, 118 Pac. 60, the syllabus reads:

"Where the authority of a claim agent of a railroad company to make a contract embracing unusual stipulations is denied under oath it devolves on the opposing party to prove that the agent had such authority, and neither evidence of the statements of the agent nor the fact that he made that particular contract is sufficient to establish his authority."

"Proof that he was a claim agent with authority to settle claims against the company is not sufficient to establish that he had the implied authority to contract that the claimant should be employed in the service of the company for life or as long as he might desire to work. Nor is the mere fact that the claimant was given work for a brief time after the settlement was effected sufficient to prove that the agent was vested with authority to promise him permanent employment by the company." (¶¶ 4, 5.)

The above case was referred to in *Townsend v. Railway Co.*, 88 Kan. 260, 128 Pac. 389. There it was shown the division engineer had made a contract in connection with work on the right of way. The company denied his authority. It was held:

"An act of an agent which is within the apparent but not within the real scope of his authority is binding upon the principal where otherwise loss would result to one who has in good faith relied upon such appearance." (Syl. ¶ 1.)

"An act is within the apparent scope of an agent's authority when a reasonably prudent person, having knowledge of the nature and usages of the business, is justified in supposing that he is authorized to perform it, from the character of the duties which are known to be intrusted to him." (Syl. ¶ 2.)

Appellee relies, in part, on *Aultman v. Knoll,* 71 Kan. 109, 79 Pac. 1074, in which it was held:

"A principal is bound by the contracts of his agent made within the apparent scope of his authority notwithstanding limitations of the agent's power, if the party dealing with the agent be ignorant of such limitations." (Syl. ¶ 3.)

The Aultman Company's agent, in selling a threshing outfit, promised to do certain threshing. The company denied its authority. It was held that if the agent had authority to take a certain note, but no authority to make the promise to do the threshing, it was nevertheless bound because the promise was within the apparent scope of the agent's authority. A reading of the decision will show many elements not involved in the case before us.

Appellee also relies on *White Sewing Machine Co. v. Edwards,* 120 Kan. 151, 242 Pac. 129, and *Diehl v. Barker,* 137 Kan. 255, 20 P. 2d 534, both sewing-machine cases, where it was contended that certain agreements as to sales were beyond the authority of the agents. In the White sewing-machine case the agent omitted from the copy of the contract sent the company a statement included in the buyer's copy with reference to assistance in selling the machines. It was held the company was chargeable with knowledge and could not repudiate a part of the contract and take advantage of the rest. In the *Diehl v. Barker* case there were two agreements, one for sale and purchase and one for demonstration to buyers, etc. It was held the two contracts must be construed together. Neither of the above cases supports appellee's position.

Appellee also directs our attention to *Wilson v. Haun,* 97 Kan. 445, 155 Pac. 798, and to *Hyson v. Bankers Mortgage Co.,* 136 Kan. 259, 14 P. 2d 726. In the Haun case an agent was sent out to buy cattle and furnished with a book of drafts to be used in paying for them. He was cautioned as to the price he was to pay. He bought Wilson's cattle and Haun would not honor the draft, claiming it was for an amount greater than the value of the cattle. It was held that the evidence as to the draft book, the purchase by the agent of other cattle, etc., was sufficient to warrant the finding of agency. In the Bankers Mortgage Company case the company sent out an

agent to sell bonds, furnishing him with note forms payable to the company or bearer. Plaintiff bought a bond, signing an application form which stated all payments must be made by check to the company. At the time, she expected to sell another bond to raise money to pay, and she gave a demand note on the company's form. A few days later the agent returned and she signed a check payable to the company or bearer. The agent indorsed the check and absconded. Defendant denied liability on the ground the agent was not authorized to indorse the check. It was shown that agents of the company had sold for cash and the company had delivered the bonds. The plaintiff recovered, this court saying:

"Where a principal has clothed its agent with power to sell its bonds and with apparent authority to complete a sale thereof, a third person dealing with such agent in entire good faith, pursuant to such apparent authority, who purchases and pays for a bond, may rely on such representations and apparent authority, and the principal is estopped to deny the existence of such power." (Syl. ¶ 1.)

Other cases to the same effect as those noted are cited in the briefs.

The contract sought to be enforced here contained a provision not usually incident to a purchase of corporate stock, and the burden of proof to show that it was within the apparent authority of the agent to make it rested upon the plaintiff. There is no showing that Campbell had represented the Smyths on any other occasion, to purchase stock or to do anything else. When the contract was made, Siedhoff knew whom Campbell represented, but made no inquiry as to the extent of his authority or of his right to bind his principals to pay the construction bills. It is true the jury found Siedhoff exercised reasonable care and prudence concerning Campbell's power to deal in the matter and was justified in believing he was so authorized. The difficulty in that lies here: the fact the contract was made with no evidence of authority to make it; there had been no course of dealings between the Smyths and Campbell with Siedhoff that gave rise to any presumptions; Siedhoff knew that Campbell was a special agent, but made no inquiry as to the extent of his powers, either from Campbell or his principals; the provision about paying bills was foreign to the purchase of corporate stock, at least it was unusual, and the result is there was no evidence to support the jury's findings. Under the circumstances, Siedhoff acted at his peril in not making inquiry as to the extent of Campbell's authority.

Neither can it be said that Siedhoff is not bound by secret limitations on the agent's authority. Under the facts here, that Campbell was not authorized to bind the Smyths to pay construction bills of the theater company was not a secret limitation any more than would be his lack of authority to agree to do some other act entirely foreign to the purchase of corporate stock.

Nor can it be said there was any ratification by the Smyths. The extent of the evidence is that they were not informed of that provision of the contract until the petition was filed and they immediately denied the agent's authority and tendered back the stock. We are not here concerned with the fact the stock may now be valueless.

It may also be remarked that if the agreement be construed as one to pay the debt of a third party, it was within the statute of frauds and Campbell was not sufficiently authorized in writing to make any such contract.

Claims of errors on account of the court's rulings on admission of evidence, on requiring plaintiff to elect as to recovery from agent or principals, on appellant's demurrer to plaintiff's evidence, in giving and refusing instructions to the jury, etc., need not be separately discussed.

The plaintiff having failed to prove the authority of Campbell to make the contract relied on, it follows that the judgment in favor of the appellee was erroneous, and it is reversed, and the cause remanded with instructions to render judgment in favor of appellants.