No. 50,344

ROBERT BLAKESLEY, *Plaintiff-Appellee,* v. ROY L. JOHNSON, *Defendant-Appellant,* and V. A. LATHEM WATER SERVICE, INC., *Defendant.*

(608 P.2d 908)

Opinion filed April 5, 1980.

*R. H. Calihan, Jr.,* of Calihan, Green, Calihan & Loyd, of Garden City, argued the cause and was on the brief for the appellant.

*Don O. Concannon,* of Concannon, Samson & Boelte, of Hugoton, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a civil action from a judgment of the trial court ordering Roy L. Johnson (defendant-appellant) to account to Robert Blakesley (plaintiff-appellee), a minority stockholder, for the latter's equitable share of the proceeds from the sale of corporate stock. The appellant raises several issues on appeal. Prior to trial the lower court granted a partial summary judgment, dismissing V. A. Lathem Water Service, Inc., as a defendant.

The trial court made 29 separate findings of fact and six conclusions of law. The factual findings are not challenged on appeal.

In August 1973, Blakesley began working as a truck driver for Johnson and V. A. Lathem Water Service, Inc.; within three weeks Blakesley assumed foreman duties. The business of V. A. Lathem Water Service, Inc., was the delivery and removal of large quantities of water used in oil and gas exploration and production. The nature of the business required constant operation—24 hours per day, seven days per week.

On April 1, 1974, after eight months' employment, Blakesley entered into a stock purchase and employment contract with V. A. Lathem Water Service, Inc., and Johnson. Blakesley agreed to purchase 37 shares of the corporation's unissued stock, and agreed to assume duties as manager of the business. Blakesley promised to pay $50,000 for the stock over a twelve-year period, with 6% interest per annum, in annual installments of $5,625. The corporation promised to hold the 37 shares of stock in escrow until paid in full; Blakesley was given the right to vote the 37 shares at stockholders meetings. Blakesley was appointed manager of the corporation by the same agreement. Blakesley and Johnson agreed to yearly salaries of $15,000 for Johnson and $13,000 for Blakesley. In addition, Blakesley was promised a bonus of 15% of the net profit each year, with a minimum bonus of $7,500 guaranteed. Finally, Blakesley and Johnson made a "buy and sell agreement," which granted to each other the first option to purchase the corporate stock of the other and a second option to the corporation.

The trial court found the original contract between Blakesley and Johnson was prepared by Edwin Hooper, C.P.A., the corporation's accountant. The trial court specifically found that the

contract was prepared "at the insistence of both" Blakesley and Johnson. The agreement was discussed among the three men, and revised. The contract was not submitted to or reviewed by an attorney, despite Hooper's suggestion that the parties consult an attorney for advice.

Johnson owned 110 shares of the 111 issued shares of stock; Johnson's wife owned the single share. The corporate charter authorized issuance of 250 shares at $100 per share. After the sale to Blakesley, the total outstanding shares numbered 148.

A stockholders meeting was held on April 1, 1974. Blakesley, Roy Johnson and Betty Johnson elected themselves to the board of directors. Roy Johnson was elected president of the corporation, Blakesley was elected vice-president, and Betty Johnson was elected secretary-treasurer.

Blakesley attended all stockholder and board of directors meetings. At the March 27, 1975, stockholder and board of directors meeting, Edwin Hooper reported the corporation's financial condition. Hooper, Blakesley and Johnson also discussed the salaries and management bonus. Sometime prior to August 1975 Blakesley conferred with Hooper about disposition of the corporate stock. Hooper advised Blakesley that his minority stock should sell for the same price per share as the majority stock.

As manager and stockholder of the corporation Blakesley knew the business demands, customers, equipment owned, and rates and volume of water supply. Blakesley's wife was also employed by the corporation to prepare invoices and bill the customers.

The trial court made the following pertinent findings of fact in regard to the actual discussions about the sale of the corporate stock:

"8. During the month of July, 1975, Don H. Carpenter, while on vacation from his duties in the Ulysses area as field engineer for Amoco Production Company, called defendant Roy Johnson by long distance telephone from Oklahoma to inquire whether he would be willing to sell the business of V. A. Lathem Water Service, Inc. At this time Johnson indicated that he would be willing to sell and the conversation was concluded with the agreement that the two of them would discuss the matter at a later time.

"9. Upon Don H. Carpenter's return from vacation, he went to the business office of V. A. Lathem Water Service, Inc. and conferred further with defendant Roy L. Johnson about the purchase of the business. At this time no firm agreement to purchase and sell was made by the parties and no purchase price was set. At a later time and place the parties again conferred and a base price of $370,000.00 subject to adjustments for certain assets and liabilities which were at that time

undetermined but which the parties agreed would be ascertained and applied to the adjustment of such purchase price.

. . . .

"18. During the forepart of August, 1975, plaintiff, Robert Blakesley and defendant, Roy Johnson had a conversation in the course of which plaintiff was advised that defendant intended to sell the business of V. A. Lathem Water Service, Inc. and that plaintiff had the first right to purchase the same if he desired. Shortly after this conversation plaintiff took his vacation and upon his return had another conversation with defendant, Roy L. Johnson, in which plaintiff inquired how much 'down money' defendant Johnson would require if plaintiff were to purchase the business. The defendant's response was that he would have to have $80,000.00 to $90,000.00 which would be approximately 27% of the total purchase price. During this conversation defendant informed plaintiff that he would protect him in the matter if he did not wish to dispose of his stock and make arrangements for him to retain his employment as manager of the corporation. At this point plaintiff informed defendant that he wanted out, would not be Number Two man to anyone, and that he wanted his money back on the purchase of the 37 shares of stock. Following this conversation defendant negotiated his transactions with Don H. Carpenter, Willynda H. Carpenter and V. A. Lathem Water Service, Inc. to the conclusion heretofore recited.

"19. During his conversations with Don H. Carpenter, defendant informed him that plaintiff had the first right to purchase the business of V. A. Lathem Water Service, Inc. and, following defendant's conversation with plaintiff, upon plaintiff's return from vacation, Defendant told Don H. Carpenter that Plaintiff did not want the business and that the stock necessary for control would be available to the Carpenters for purchase.

. . . .

"22. At no time material herein did Plaintiff make any inquiry as to the financial condition of V. A. Lathem Water Service, Inc., or the value of the common stock of such corporation. Defendant, Roy Johnson, made no representations concerning the value of such stock to the Plaintiff, was ready, able and willing to recognize Plaintiff's right to purchase the business of V. A. Lathem Water Service, Inc. and told Plaintiff nothing about the affairs of the corporation or his sale transaction with the Carpenters that was untrue, but did not reveal to Plaintiff the sales price or share value in the sale of the business negotiated prior to the re-purchase.

. . . .

"26. Plaintiff was aware of Roy L. Johnson's intent to sell his stock in V. A. Lathem Water Service, Inc. from the forepart of August, 1975 up to and including the date of his resignation as manager, director and Vice President of V. A. Lathem Water Service, Inc. on September 30, 1975.

. . . .

"29. . . . .

"Defendant received $338,000.00 from the sale of the corporation which includes Plaintiff's 37 shares. The Carpenters would purchase the corporation only if they received all the outstanding stock."

On August 15, 1975, Don Carpenter tendered his resignation to AMOCO Production Company. On September 1, 1975, Carpenter

and his wife became employees of the corporation. They were employed to familiarize themselves with the business prior to assumption of management and control on October 1, 1975.

On September 30, 1975, Blakesley signed an agreement for the corporation to repurchase his 37 shares of stock. Blakesley was then indebted to the corporation for $48,542.25, which was the remainder of the original purchase price for the 37 shares. The September 30 stock-purchase agreement forgave the unpaid balance, and provided for payment to Blakesley of an additional sum of $2,871.60. That sum represented a return of a principal payment on the stock made by Blakesley in March 1975. The same agreement recited Blakesley's entitlement to one-half of his $13,000 yearly salary and one-half of the 15% management bonus. Blakesley executed an assignment of the 37 shares to the corporation on the same day, and tendered his resignation as the corporation's manager, officer and director.

The next day, on October 1, 1975, Johnson, the corporation, and Don and Willynda Carpenter executed a stock-purchase agreement. Don Carpenter purchased from the corporation two newly issued shares of stock for $5,000. Willynda purchased from the corporation eighteen newly issued shares for $55,000. Don Carpenter purchased sixteen shares from Johnson for $50,000.

On October 15, 1975, Johnson and the corporation executed a "stock termination redemption agreement." By this agreement the corporation redeemed Johnson's remaining 94 shares for $288,000. When both the October 1 and October 15 agreements are considered together, the Carpenters obligated themselves to pay $398,000 for 130 shares of corporate stock. Johnson was to receive $338,000 of that sum.

The trial court rendered six conclusions of law, as follows:

"1.  Defendant contends the stock sale agreement (Plaintiff's Exhibit # 1) is void for want of mutuality in that no fixed period of employment was set forth as obligating the parties. The court finds at least the portion providing for sale of stock to the Plaintiff is not made contingent on any other factor and is a valid agreement between the parties.

"2.  Defendant also contends that the provision for Plaintiff to assume responsibility as manager was breached by Plaintiff and that the agreement dated September 30, 1975, is a mutual rescission of the original agreement set forth above. While there was some evidence that Plaintiff was on occasion somewhat cantankerous or testy, there was no pattern of conduct to indicate a breach of his duties but rather conduct consistent with an employee on 24 hour call and duty seven days a week. Plaintiff signed the 'agreement' for sale of his shares as

requested by Defendant but did not cash the check therefor or agree to the amount tendered. Hence, there was not a mutual rescission of the original agreement.

"3.   Johnson, the majority and dominant stockholder in V. A. Lathem Water Services, Inc., occupied a fiduciary relationship to Blakesley as a minority stockholder (Delano v. Kitch, 542 F2d 550 [1976] Syl 3 and Syl 4).

"4.   The burden of proof is upon the dominant stockholder in his fiduciary capacity to show affirmatively that the transaction was conducted in good faith and that there was a full disclosure of all material facts affecting the value of the corporate stock before any validity can attach to the sale. Where one director or officer of a corporation has a superior knowledge of corporate affairs because he is intimately involved in the daily financial operation of the corporation and the other director or officer has only a limited role in the routine operation of servicing the customers of the corporation, the fiduciary duty is the same as if the minority stockholder were not actively engaged in corporate affairs. (Sampson v. Hunt, 222 K 268, 271) (Stewart v. Harris 69 K 498, 77 Pac 277)

"5.   Where knowledge of facts affecting the value of the price of stock comes to an officer, director and dominant stockholder by virtue of his ownership of said stock and his position in the company, he is under a fiduciary duty to disclose such facts to the other stockholder before dealing in company stock with minority stockholders including the fact that he had set a value on the sale of the company to an individual who required 100% thereof. (Sampson v. Hunt, 222 K 268, Syl 2)

"6.   The purchase price of $338,000.00 divided by the 148 outstanding shares means each share sold for $2,283.78 and thus Plaintiff's share of the sale would be $84,499.86. Thus, Defendant is obligated to Plaintiff in the sum of $34,499.86, plus interest from September 30, 1975."

Judgment was entered for Blakesley against Johnson in the sum of $34,499.86 plus interest from September 30, 1975, and for costs of this action.

Johnson duly filed a notice of appeal to the Kansas Court of Appeals. Pursuant to the authority granted in K.S.A. 1979 Supp. 20-3018(c) the case was transferred to the Supreme Court on April 13, 1979.

Johnson first contends the original contract with Blakesley was void for want of consideration and lack of mutuality. Johnson argues that the stock-purchase provisions were tied to the management employment provisions; that there was no duration specified for Blakesley's employment; and that there was no remedy if Blakesley defaulted on the stock purchase. The trial court concluded the stock-purchase provision of the contract was not contingent on any other factor and was a valid separate agreement between the parties.

We agree with the trial court; the portion of the contract governing sale of stock was a valid agreement supported by consideration and mutual promises. Whether or not a contract is

entire or divisible is a question of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it. *Big Chief Sales Co., Inc. v. Lowe,* 178 Kan. 33, 39, 283 P.2d 480 (1955); *Sykes v. Perry,* 162 Kan. 365, 369-70, 176 P.2d 579 (1947).

When Blakesley resold his stock to the corporation in September 1975 he resigned as manager the same day. However, that does not conclude the inquiry. No language in the contract expressly tied the employment provisions to the stock-purchase provisions. By its general character the contract dealt with two separate subjects: stock purchase and employment. There is no reason to conclude that Blakesley had to retain his stock to continue as manager, or that Blakesley was required to continue as manager as long as he was a shareholder. We are not required to determine whether the employment provisions were supported by consideration and mutuality of obligation. The trial court correctly determined the stock-purchase provisions were severable.

There was no want of consideration or lack of mutuality of obligation in the stock-purchase provisions. Both Blakesley and Johnson bound themselves to legally enforceable promises. Blakesley began to perform his obligations by making the first payment in March 1975. He exercised his shareholder rights by voting and participating at meetings. Johnson and the corporation duly performed their legal obligations by placing the stock in escrow, accepting payment, and recognizing Blakesley's rights.

Johnson next contends the original agreement was mutually rescinded by the September 30, 1975, agreement. Blakesley's statements that he wanted out, that he would not be second man, and that he wanted his money back on the purchase of the 37 shares are cited as proof of intent to rescind. The trial court ruled there was no rescission of the original agreement because Blakesley did not cash the check or agree to the amount tendered, although he did sign the September 30 agreement.

Rescission depends upon the intent of the parties as shown by their words, acts, or agreement. Parties to a contract may mutually rescind the transaction although neither party had a right to compel a rescission. *Owens v. City of Bartlett,* 215 Kan. 840, 844, 528 P.2d 1235 (1974); *Peoples Finance Co. v. Burdg,* 128 Kan. 390, 277 Pac. 796 (1929).

We are satisfied no rescission was intended or accomplished. The original agreement specifically provided for future stock transfers between shareholders and the corporation. The "buy and sell" procedures outlined in the original agreement were not followed by the parties. Johnson's offer to sell to Blakesley was oral and not in writing or for the requisite period of time. However, Blakesley and Johnson were acting pursuant to the terms of the original agreement when the September 30, 1975, agreement was executed. They recognized the validity of the stock-purchase agreement. The original contract was three-sided, including Johnson, Blakesley and the corporation. The September 30 contract was between only Blakesley and the corporation, of which Johnson was the majority shareholder. The failure of Blakesley to cash the check is immaterial to the issue of rescission for the reasons hereafter stated.

Johnson contends he had no duty to inform Blakesley of the price Carpenter was willing to pay for the corporation stock. Johnson argues he had a legal right to negotiate and procure the redemption and sale of his majority stock independently of Blakesley's minority stock interest. Johnson relies on *Ritchie v. McGrath*, 1 Kan. App. 2d 481, 571 P.2d 17 (1977). On oral argument, Johnson's counsel further argued that if a duty existed to inform Blakesley of the price, then that duty was fulfilled by the information supplied. Blakesley was told that purchase would require $80,000-$90,000 down, which was about 27% of the total price. Johnson argues Blakesley could have used simple mathematics to calculate the total price—ranging from approximately $296,296 to $333,333; and the value on each of the 148 shares— ranging from approximately $2,002-$2,252. Blakesley was paying $1,351.35 per share under the original agreement.

The Court of Appeals decision in *Ritchie v. McGrath*, 1 Kan. App. 2d at 490, is distinguishable on its facts. There the court stated:

"This is not a case where an officer or director, with undisclosed knowledge of information affecting the value of stock, goes about buying up shares from minority shareholders, which he in turn sells at a profit. Here, the shares sold were already owned at the time of the offer to purchase, and those shares were not acquired from any of the plaintiffs."

This *is* a case where an officer, director and majority shareholder,

with undisclosed knowledge affecting the sale value of the stock, negotiated a purchase of shares from a minority shareholder, which he in turn sold for a profit. By effecting a corporate redemption of Blakesley's 37 shares of stock, Johnson maneuvered himself in a position to sell all of the outstanding corporate stock to Carpenter, who made purchase of all stock a condition of his agreement to purchase at the price specified. The result in this case is controlled by our decisions in *Newton v. Hornblower, Inc.,* 224 Kan. 506, 582 P.2d 1136 (1978), and *Sampson v. Hunt,* 222 Kan. 268, 564 P.2d 489 (1977).

In *Sampson v. Hunt,* 222 Kan. 268, Syl. ¶¶ 1, 2, we stated:

"Corporate directors and officers are under a very strict fiduciary duty in their relations both to the corporation and to its stockholders."

"Where knowledge of facts affecting the value or price of stock comes to an officer or director of a corporation by virtue of his office or position, he is under a fiduciary duty to disclose such facts to other stockholders before dealing in company stock with them, even if they too are directors or officers, and regardless of whether these facts pertain to intracompany matters, such as the value of assets, or relate to events 'outside' the corporation, such as the existence of favorable contracts, the availability of additional financing, or any other matters which would tend to increase the value of the corporation's stock."

In *Newton v. Hornblower, Inc.,* 224 Kan. 507, Syl. ¶¶ 8, 9, 10, we stated:

"Officers and directors of a corporation occupy a strict fiduciary relationship with respect to both the corporation and its shareholders. The same fiduciary standard applies as between directors."

"Any unfair transaction undertaken by one in a fiduciary relationship may result in liability for unjust enrichment of the fiduciary. Where the fairness of a fiduciary transaction is challenged, the burden of proof is upon the fiduciary to prove by clear and satisfactory evidence that such transaction was fair and done in good faith."

"Where the trial court found that corporate directors failed to meet the burden of proof in showing good faith and the fairness of certain questioned transactions, and where such finding is supported by competent evidence, the finding will not be disturbed on appeal."

Applying the above rules to the facts of this case we must conclude that Johnson, as president, director, and majority shareholder of the corporation, committed a breach of his fiduciary duty to Blakesley, a director, manager, and minority shareholder. Johnson failed to disclose material information affecting the value of the corporate stock *before* the September 30, 1975, agreement was executed by Blakesley. While Blakesley could

have calculated a price range to determine the value of the stock upon information Johnson provided in his offer to sell to Blakesley, it is undisputed that Johnson never disclosed the actual price to Blakesley that Johnson had negotiated with Carpenter. A condition of the sale to Carpenter at the negotiated price was delivery of all of the corporate stock. This fact was not disclosed by Johnson to Blakesley, and it was the fulfillment of this condition by Johnson in negotiating the sale that commanded the price Carpenter was willing to pay. Absent full disclosure by Johnson to Blakesley, on September 30, 1975, Blakesley's shares were purchased by the corporation for approximately $1,389 each. On the facts in this case redemption of Blakesley's shares of stock by the corporation was equivalent to a purchase of these shares by Johnson. The day after Blakesley's shares were purchased by the corporation Don Carpenter purchased two shares from the corporation for $2,500 each; Willynda Carpenter purchased eighteen shares from the corporation for approximately $3,055 each; Don Carpenter purchased sixteen shares from Johnson for approximately $3,125 each.

The most decisive information withheld from Blakesley by Johnson was that the Carpenters would complete the purchase only if they received 100% of the corporate stock. Although Blakesley had access to general information concerning the value of the corporation's stock, Johnson as the majority shareholder and as president of the corporation had superior knowledge regarding the transaction with the Carpenters. Under our case law Blakesley had a legal right on the facts in this case to rely upon Johnson to make a full disclosure.

The judgment of the lower court is affirmed.

FROMME, J., not participating.