**SHARP ELECTRONICS CORPORATION,**
Plaintiff,

v.

**LODGISTIX, INC., Defendant.**

Civ. A. No. 89–1063–T.

United States District Court,
D. Kansas.

Aug. 1, 1991.

Steven J. Rupp and Craig A. Kreiser, Curfman, Harris, Borniger, Rose & Weltz, Wichita, Kan., for plaintiff.

David L. Nelson, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the motion of plaintiff ("Sharp") for partial summary judgment on the issue of liability (Doc. 30). This is a diversity action for breach of contract.

## I. BACKGROUND

The dispute concerns certain purchase orders placed with plaintiff that were allegedly made by defendant ("Lodgistix") through defendant's agent—Preferred Technologies, Inc. ("Preferred"). Throughout late 1987 and early 1988, Preferred was developing a converter box to be installed in hotel rooms that provided pay-for-view television and in-room checkout services. This was known as the "TV Mate" project and was Preferred's only major project. The president of Preferred was Christie Tyler. The senior buyer for Preferred from September 1987 through January 1988 was Lori Yavorsky. The executive vice president of defendant was Jim Lew.

Defendant and Preferred executed an asset purchase agreement on March 8, 1988, whereby defendant agreed to acquire certain assets of Preferred. It is disputed whether a merger of defendant and Preferred occurred before this date. During the time frame of October 1987 through December 1987, Yavorsky had been working with defendant on the TV Mate project. Yavorsky became an employee of defendant as its senior buyer on February 1, 1988.

The specific issue presented in this motion concerns the scope of Yavorsky's authority to contract on the behalf of defendant with plaintiff for two purchase orders, one of which was placed before Yavorsky officially became defendant's senior buyer on February 1, 1988, and the other after she assumed this position with defendant. The first purchase order was for 10,000 base band tuner kits ("tuner kits") and the second was for 10,000 remote control units, both of which were to be used in the TV Mate project.

Unless otherwise qualified, the following facts are either conceded or not specifically controverted.

1. In October 1987, Lodgistix sent its purchase order forms and stationery to Preferred. Thereafter, Preferred began making purchases on Lodgistix's purchase orders. Copies of correspondence relating to the purchase orders, as well as the purchase orders themselves, were sent to defendant's accounting department. (Plaintiff's statement of facts, ¶ 4).

2. No written procedures existed regarding limitations on Preferred's use of defendant's purchase order forms or regarding whose approval Yavorsky had to obtain to make purchases on defendant's behalf. There is evidence, however, that Yavorsky had met with defendant's purchasing manager early in the relationship to discuss these matters. There is conflicting evidence regarding Yavorsky's understanding of the need for prior approval by defendant. (Plaintiff's statement of facts, Doc. 31, ¶¶ 5, 6; Defendant's statement of facts Doc. 33, ¶ 5).

3. Yavorsky negotiated the purchase of the tuner kits with Dan Troutt, an employee of Impaq Sales Company, which was the authorized agent of plaintiff.

4. Troutt has testified that at the relevant times of the subject purchase orders, Yavorsky had represented that Preferred had already been purchased by defendant. Troutt believed that Innvision (Preferred's trade name) was part of Lodgistix. (Defendant's statement of facts, Doc. 33, ¶ 7; Plaintiff's reply, Doc. 38, at 3).

5. Troutt sent Yavorsky a letter dated November 23, 1987, quoting on behalf of plaintiff the price of the tuner kits to be used in the TV Mate project. This quote also stated: "Delivery is 90 to 120 days ARO," which meant that plaintiff would be able to deliver within 90 to 120 days after the purchase order. (Plaintiff's statement of facts, Doc. 31, ¶ 8).

6. In a memorandum dated November 24, 1987, Yavorsky notified Jim Lew of Lodgistix of Preferred's desire to purchase from plaintiff a quantity of 51,000 tuner kit units. This memorandum also informed Jim Lew that "[i]n the event of cancellation, we would be liable for all units scheduled in the 120–day window from the date of cancellation." Yavorsky has stated that her understanding of the agreement was that "if we were commit to cancel the order today, we would be already committed to accept shipment on the product scheduled out from 120 days from today, assuming all of the product was scheduled to ship by sea." (Plaintiff's statement of facts, Doc. 31, ¶ 9).

7. Jim Lew did not agree with the proposed purchase quantity of 51,000 units and instructed Yavorsky to order no more than 10,000 units.

8. During this same time, Lodgistix provided to plaintiff, through Impaq, certain financial information, which demonstrated Lodgistix's creditworthiness.

9. On December 3, 1987, Lori Yavorsky sent a cover letter and purchase order on Lodgistix letterhead to Impaq Sales Company. This order was for a quantity of 10,000 units, and it requested delivery according to the following schedule: 1,000 units on March 3, 1988; 3,000 units on April 1, 1988; 5,000 units on April 15, 1988; and 1,000 units as "safety stock" for which no delivery date was scheduled. (Appendix "G" and "I" to plaintiff's memorandum in support of motion). The terms requested by Yavorsky are that the tuners be shipped "FOB: Destination" to InnVision at Richardson, Texas and billed to Lodgistix in Wichita, Kansas. The purchase order also states: "Please confirm the above back to me. If you have any questions, please call." The letter indicates that copies were sent to Jim Lew of Lodgistix and Chris Tyler of Preferred. Yavorsky also sent a facsimile of the cover letter to Jim Lew. The cover sheet of the facsimile message states: "Jim—Please get back to me today if you have any issue with the attached." (Appendix "H" to plaintiff's memorandum in support of motion); (Plaintiff's statement of facts, Doc. 31, ¶ 12).

10. On December 17, 1987, Lew wrote Yavorsky and Tyler, stating in part:

I had spoken with Lorie about the Sharp tuner order which she was able to reduce to a 10,000 order for the time being. Realizing that there is a 4 month lead time on these tuners, both George and I understand that we need to have inventory on order and being shipped to us. My only concern in the present schedule is the close proximity of receipt of 10,000 units within a 45 day period. Not only do we have to pay for them, but it is questionable whether we need that many do [sic] begin production with given our current lack of sales forecasting. The production schedule at this time is excessive until we have better sales forecast information.

I would like to have someone tell me whether I have listed all of the purchase orders or not.... Additionally, the 10,-000 tuners must be spread out.

(Appendix "J" to plaintiff's motion in support).

11. By letter dated December 18, 1987,[1] plaintiff "acknowledge[d] the receipt and acceptance of" the December 3 purchase order sent by Yavorsky. This letter stated: "Deliveries are as requested unless stated otherwise in the acutal [sic] delivery column." (Appendix "L" to plaintiff's motion in support).

12. By cover letter and purchase order on Lodgistix letterhead dated February 11, 1988, Yavorsky placed an order with plaintiff for 10,000 remote control transmitters. The hard copy of this purchase order was sent to plaintiff, and a copy would have been forwarded to defendant. (Plaintiff's statement of facts, Doc. 31, ¶¶ 16, 17).

13. On or about March 22, 1988, Dan Troutt of Impaq gave notice to Sharp to cancel delivery of the balance of the units to be shipped. This action was apparently prompted by notice given by defendant to Impaq on or about March 17 that defendant intended to cancel the subject purchase orders. (Plaintiff's statement of facts, Doc. 31, ¶ 20; Defendant's statement of facts, Doc. 33, ¶¶ 18, 20). At this time, only 1,000 tuner kit units had been received by defendant.

14. By letter dated April 1, 1988, Jim Lew of Lodgistix formally notified Impaq, as the agent of plaintiff, that Lodgistix canceled all further purchases from plaintiff, and that Lodgistix would not accept delivery of the remaining 9,000 units to be shipped. (Appendix "S" to plaintiff's motion in support).

## II. DISCUSSION

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at

---

1. The stamped date of "Dec 23 1987" appears below the typed date of December 18, 1987.

323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513.

The parties have stipulated agreement that Kansas law governs this action. (Pretrial Order, Doc. 36, at 2). Defendant also concedes that Preferred was acting in the capacity of purchasing agent for defendant. *Id.* at p. 7; Doc. 35, at 3. The only issue presented is whether Preferred exceeded the scope of its agency authority with respect to the two purchase orders in dispute.

"The law recognizes two distinct types of agencies, one actual and the other ostensible or apparent." *Mohr v. State Bank of Stanley*, 241 Kan. 42, 734 P.2d 1071, syl. ¶ 1 (1987). Plaintiff relies on both theories as a basis for imputing the acts of Preferred to defendant.

### A. *Actual Authority*

■ The court articulated the contours of an actual agency in *Shawnee State Bank v. North Olathe Indus. Park, Inc.*, 228 Kan. 231, 613 P.2d 1342 (1980).

The authority of an actual agent may be either express or implied.

It is an express agency if the principal has delegated authority to the agent by words which expressly authorized the agent to do a delegable act. It is an implied agency if it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal.

*Id.* at 236–37, 613 P.2d 1342. In contrast to apparent authority, actual authority is determined according to the manifestations as between the principal and agent, rather than the appearance of authority to a third party. *Brown v. Wichita State Univ.*, 217 Kan. 279, 287, 540 P.2d 66 (1975) (quoting 2A C.J.S. *Agency* § 52, at 626), *aff'd in part, vacated in part on other grounds*, 219 Kan. 2, 547 P.2d 1015 (1976).

■ There is no dispute that Yavorsky had the express authority to place an order for 10,000 units with plaintiff. Jim Lew admits this in his affidavit submitted to the court: "I authorized Yavorsky to place an order for 10,000 units, if required, in order to obtain more favorable pricing terms, but to only commit to the purchase and delivery of the initial 1,000 pending successful completion of the TV–MATE beta." The only issue is whether Yavorsky had the authority to "commit" to a "non-cancelable" order of the entire 10,000 units with the delivery schedule set forth in the purchase order she submitted.[2]

A number of facts tend to support the existence of Preferred's actual authority to commit defendant to the purchase of 10,000 units. First, the cover letter of the December 3 purchase order, which contains none of the qualifications asserted by defendant, was sent to Jim Lew. Second, it was not until December 17 that Lew voiced any objection to this order. *See, e.g., Schraft v.*

---

**2.** Defendant has presented no evidence or allegation that it communicated to Yavorsky any limitations on her authority to place the February 11, 1988 purchase order for the 10,000 remote control units. At this time, Yavorsky had assumed her position with defendant as its senior buyer, and there appears to be no dispute as to her express authority to place this order.

Although the contention is not made by defendant, the court assumes for purposes of this motion that the limitations allegedly communicated to Yavorsky with respect to the first purchase order for 10,000 tuner kits also applied to the second purchase order. For this reason, the court will use the term "10,000 units" to refer to both purchase orders.

*Leis,* 236 Kan. 28, 686 P.2d 865, syl. ¶ 9 (1984) (upon acquiring knowledge of an agent's unauthorized act, the principal is presumed to have ratified that act unless he promptly repudiates). This memo indicates that Lew understood the December 3 purchase order to commit Lodgistix to 10,-000 units and a particular schedule. (Appendix "J" to plaintiff's motion in support). Finally, Yavorsky has consistently expressed her belief that she was authorized to commit to the purchase of 10,000 units.

On the other hand, defendant directs the court's attention to two pieces of evidence supporting defendant's contention as to the alleged limitations on Preferred's authority. First, defendant relies on Jim Lew's affidavit, which simply states that he communicated these limitations to Preferred. ¶ 9. *See Theis v. duPont, Glore Forgan, Inc.,* 212 Kan. 301, 307, 510 P.2d 1212 (1973) (express directions not to make purchase on specific date precluded finding the employee had implied authority). The December 17 memo from Lew to Yavorsky and Chris Tyler provides the only documentary indication that these limitations were communicated to Preferred prior to plaintiff's December 18 acceptance of the purchase order. Lew stated:

> My only concern in the present schedule is the close proximity of receipt of 10,000 units within a 45 day period. Not only do we have to pay for them, but it is questionable whether we need that many do [sic] begin production with given our current lack of sales forecasting. *The production schedule at this time is excessive until we have better sales forecast information.*
> .... [T]he 10,000 tuners must be spread out.

(Appendix "J" to plaintiff's motion in support; emphasis added). Defendant also states that "the authority conferred upon Preferred was with regard to a specific project or transaction, i.e. the purchase of sufficient materials to beta test Preferred's TV–MATE product." (Doc. 35, at 5). Defendant alleges that the purchase of 10,000 units exceeded the requirements for testing the product, and therefore, that Preferred had no implied authority to commit to this quantity.

Viewing the evidence in a light most favorable to defendant, the court finds that an issue of fact remains regarding whether defendant had expressly limited Preferred in its actual authority to commit to the purchase of 10,000 units. Jim Lew's representation that he communicated this limitation to Preferred essentially presents an issue of credibility, which is ill-suited to resolution through summary judgment.

**B.  *Apparent Authority***

"Apparent authority is based on intentional actions or words of the principal toward third parties which reasonably induce or permit third parties to believe that an agency relationship exists." *Mohr v. State Bank of Stanley,* 241 Kan. 42, 46, 734 P.2d 1071 (1987). Defendant contends that its only actions or words towards plaintiff relevant to the issue of apparent authority was the act of defendant providing its purchase orders to Preferred. Defendant states that "the issue is not whether an agency existed by virtue of apparent authority," which agency concededly existed under defendant's express directions to Preferred, but rather, whether defendant's actions or words toward plaintiff acted to expand the actual authority of Preferred to include contracting for a "non-cancelable purchase" of 10,000 units. (Doc. 35, at 8–9).

Defendant's argument relies on the distinction between "general agents" and "special agents."

> A general agent is usually authorized to do all acts connected with the business or employment in which he is engaged, while a special agent is only authorized to do specific acts in pursuance of particular instructions, or with restrictions necessarily implied from the act to be done.

*Siedhoff v. Campbell,* 141 Kan. 255, 261, 40 P.2d 404 (1935) (quoting 21 R.C.L. *Principal and Agent* § 32, at 853). Defendant contends that Preferred was a special rather than general agent. The significance of this distinction to defendant's argument lies in the duty of inquiry that is imposed

upon persons who deal with special agents. Defendant relies on an authority quoted favorably by the court in *Siedhoff:*

> It is a general rule that the authority of a special agent must be strictly pursued, and this authority must be limited to the particular business and particular instructions given, and the agent cannot, by mere silence as to limitations of authority, render them ineffective. Persons dealing with such an agent must at their peril inquire into the nature and extent of his authority and deal with him accordingly, for as in the case of acts and transactions of a general agent, a special agent cannot bind his principal by acts outside the scope of his authority, except perhaps, where the principal's own negligence has enabled the agent to perpetrate a fraud thereby, and it has been held that the act of a special agent outside of his authority is voidable at the option of the principal.

*Id.* at 262, 40 P.2d 404 (quoting 2 C.J. *Agency* § 223, at 583).

■ Omitted from defendant's quotation, however, is the final sentence of this passage:

> A special authority, like a general authority, confers by implication all powers necessary for or incident to its proper execution, and acts done by a special agent while acting within the scope of his authority are binding on the principal as those of a general agent.

*Id.* *See also id.* at syl. ¶ 1. Thus, once it has been shown that the agent was authorized, either expressly or impliedly, to make representations or statements concerning the *subject matter* to which the challenged statements pertain, the principal is bound by the agent's statements. *Prairie State Bank v. Hoefgen*, 245 Kan. 236, 244, 777 P.2d 811 (1989) (quoting 1 Gard's Kansas C.Civ.Proc.2d Annot. § 60–460(h), p. 252 (1979)). *See also Mercer v. Fred Harvey Corp.*, 116 Kan. 365, 369, 226 P. 761 (1924) (where no dispute as to special agent's position to investigate and prosecute offenses against company, authority to cause an arrest will be inferred from special agent's position); *Bohart, Dilling-*ham & Co. v. Oberne, Hosick & Co.*, 36 Kan. 284, 289, 13 P. 388 (1887) (power given to an agent includes authority to do what is usual and necessary to effect purpose); *Miotk v. Rudy*, 4 Kan.App.2d 296, 300, 605 P.2d 587 (1980) ("All such acts and contracts of the agent as are within the apparent scope of the authority conferred on him, although no actual authority to do such acts or to make such contracts has been conferred, are also binding upon the principal.").

■ Assuming, without deciding, that Preferred was a special rather than general agent, the court is of the opinion that the express authority conferred on Preferred to place an order for 10,000 units necessarily carried with it the authority to commit to a "non-cancelable" order with a specific delivery schedule. The law does not recognize any right of a party to hedge its offers once accepted, nor does defendant present any evidence of a particular accepted business practice in this industry that recognizes such a deviation. To the contrary, the right of unilateral rescission that defendant claims to have sought is generally available only to those who provide for it in the agreement, *see EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447, 1452–53 (10th Cir.1990) ("termination for convenience" clause); *Emerson–Brantingham Co. v. Lyons*, 102 Kan. 733, 172 P. 513 (1918), or as an equitable remedy to the victim of fraud who ceases to accept the benefits of the contract and promptly gives notice to the other party. *See, e.g., Baker v. Penn Mutual Life Ins. Co.*, 788 F.2d 650, 662 (10th Cir.1986). *See also Blakesley v. Johnson*, 227 Kan. 495, 501, 608 P.2d 908 (1980) (although parties may mutually rescind a contract, neither party has a right to compel rescission of a contract to which there has been a valid offer and acceptance); *Stegman v. Professional & Business Men's Life Ins. Co.*, 173 Kan. 744, 252 P.2d 1074, syl. ¶ 1 (1953) ("The general rule is that a contracting party is *bound* by an agreement to which he assents, where the assent is uninfluenced by fraud, violence, undue influence, or the like, and he will not be permitted to say he did not intend to agree to its terms."; emphasis added); *Mil-*

*ler v. Alexander,* 13 Kan.App. 2d 543, 775 P.2d 198, syl. ¶ 6 (1989) ("Ordinarily there is no equity in releasing a party from a fair and reasonable contract into which he freely entered.").

■ Defendant's suggestion would impose upon third parties the obligation to inquire of the principal whether it assents to every particular of a transaction or a particular type of transaction that the agent concededly has authority to conduct on the principal's behalf. This duty finds no support in the laws of agency. Although persons dealing with a special agent have the duty to inquire of the scope of the special agent's authority, the law does not require such third parties to verify with the principal those aspects of authorized transactions that are normally incident to the exercise of the agent's actual, albeit limited, authority.

Defendant states that it "reasonably understood" that the undelivered units "remained to be scheduled by Sharp, as indicated by the notation 'Sched' under the actual delivery column." (Defendant's statement of facts, Doc. 33, ¶ 15). Defendant further states that this understanding was consistent with the December 17 memo sent by Lew to Yavorsky and Tyler, indicating Lew's desire that the delivery of the units be "spread out." How defendant may have understood the acceptance by plaintiff, however, is irrelevant to the issue of Yavorsky's apparent authority to agree to the terms of the contract. As defendant elsewhere concedes, the only issue is what plaintiff reasonably understood to be within the scope of Yavorsky's authority. *See* Defendant's Supplemental Response, Doc. 35, at 3 ("What remains genuinely at issue in this case is the nature, scope and extent of [the agency] relationship, and the reasonableness of any reliance thereon by Sharp....").

The court rejects defendant's contention that its only manifestation toward plaintiff was the act of providing Preferred with defendant's purchase orders. When defendant clothed Preferred with the actual authority to submit a purchase order for 10,-000 units, Preferred assumed the apparent authority to make this offer on the usual terms and conditions that normally attach to offers to purchase. *Cf. Anheuser-Busch v. Grovier–Starr Prod. Co.,* 128 F.2d 146, 153 (10th Cir.1942) (oral agreement by defendant's authorized agent to provide plaintiff with distributorship of unlimited duration was "unusual, unique and unreasonable as to its duration, and not reasonably within the contemplation of [defendant] by its manifestations of authority to [the agent] or third persons").

The court is likewise unpersuaded by the argument that plaintiff was aware of "some limitations" on Preferred's authority, which knowledge, according to defendant, required plaintiff to conduct further inquiry into the scope of Preferred's authority. The only such limitation cited by defendant is found in the deposition testimony of Daniel Troutt, plaintiff's agent, wherein he states that Yavorsky had told him that the Lodgistix organization would have to approve orders "before they placed orders of that size." (Troutt Deposition, at 57). This statement, however, does nothing to controvert the conceded fact that defendant did approve the orders for 10,000 units. The only question is whether plaintiff knew, or should have reasonably have been expected to inquire, whether Preferred, having received defendant's express approval to order 10,000 units, also had the apparent authority to agree to the delivery schedule and "non-cancelable" terms of such an order. Defendant has directed the court's attention to no evidence that plaintiff or its agents were actually aware of the alleged limitation on Preferred's authority, and the court has concluded that plaintiff had no such duty to inquire. Thus, the court concludes that Preferred had apparent authority to propose the contract terms accepted by plaintiff, and that defendant is bound by this contract.

IT IS BY THE COURT THEREFORE ORDERED that plaintiff's motion for partial summary judgment on the issue of liability (Doc. 30) be granted.